NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10640


COMMONWEALTH  vs.  DAVID T. MILLER.



Bristol.     May 6, 2016. – August 17, 2016.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.[1]


Homicide.  Firearms.  Search and Seizure, Warrant, Expectation
     of privacy.  Constitutional Law, Search and seizure,
     Standing to question constitutionality, Privacy.  Evidence,
     Firearm, Hearsay, Chain of custody, Immunized witness,
     Prior misconduct.  Privacy.  Jury and Jurors.  Witness,
     Immunity.  Practice, Criminal, Capital case, Motion to
     suppress, Warrant, Standing, Waiver, New trial, Jury and
     jurors, Deliberation of jury, Transcript of testimony
     before grand jury, Hearsay, Stipulation.




Indictments found and returned in the Superior Court
Department on December 15, 2006.

A pretrial motion to suppress evidence was heard by Gary A.
Nickerson, J.; a second pretrial motion to suppress evidence was
considered by John P. Connor, Jr., J.; the cases were tried
before Barbara A. Dortch-Okara, J., and a motion for a new trial
was considered by her.


Jennifer H. O'Brien for the defendant.

_____

[1] Justice Cordy participated in the deliberation on this
case and authored this opinion prior to his retirement.  Justice
Duffly participated in the deliberation on this case prior to
her retirement.

Corey T. Mastin, Assistant District Attorney, for the Commonwealth.

CORDY, J. On the evening of September 25, 2006, James Cadet was shot and killed. The defendant, David T. Miller, who lived in the same apartment complex as the victim, was indicted for the murder three months later after several witnesses, as well as evidence seized during a search of his apartment building, linked him to the crime.

The trial began in February, 2009. The defendant was allowed to conduct the trial pro se but standby counsel, who had been appointed to assist him, actively participated throughout the trial proceedings.

On February 24, the jury returned verdicts of guilty of murder in the first degree, on a theory of deliberate premeditation, and of the unlawful possession of a firearm.

The next day, standby counsel for the defendant was contacted by a juror who stated that she was troubled by the verdict, and eventually submitted a letter to the judge addressing her concerns.

The defendant subsequently filed a motion for a new trial based on information set forth in the juror's letter, arguing that extraneous material had reached the jury room and tainted the jury's verdict. The motion was denied in November, 2009,

and the defendant's appeal therefrom was consolidated with his direct appeal.

On appeal, the defendant claims error in (1) the denial of his motions to suppress certain evidence, (2) the denial of his motion for a new trial, and (3) the admission of certain evidence at trial. He also requests relief under G. L. c. 278, § 33E. We affirm the defendant's convictions.

1. Background. The defendant does not challenge the legal sufficiency of the evidence at trial, so we briefly summarize the relevant evidence.

a. The killing. At approximately 9:30 P.M. on September 25, Fall River police officers arrived at the Sunset Hill housing development (Sunset Hill) to find the victim lying on a walkway. He had been shot numerous times and had succumbed to those wounds.

Multiple witnesses observed a large person, ostensibly the shooter, wearing a dark, hooded sweatshirt in the vicinity of the crime scene shortly after hearing gunshots. One witness saw the victim fall on the shooter and the shooter kick the victim multiple times before fleeing the scene. As the shooter fled, another witness recognized him as the defendant based on his gait.

At the time of the shooting, the defendant lived in a unit in Sunset Hill that belonged to his girl friend, Christina

Helger.  The victim, who had been friends with the defendant, was also a resident of Sunset Hill.  However, on the day before the murder the defendant and the victim got into an argument after Helger had allowed the victim to use her bathroom while the defendant was not home.  As a result of this argument, the victim later returned to Helger's apartment brandishing a firearm.  The victim pointed the weapon toward her apartment and stated that there would be "problems" if she and the defendant did not leave Sunset Hill.  The victim then left without further incident.

On the day of the murder, Helger twice spoke with the some of the defendant's friends over the telephone.  These telephone calls led her to drive to a nearby fast food restaurant, meet the defendant's friends, and direct them to her apartment. Ultimately she and the group of friends entered Sunset Hill, and got as far as the first building, when they heard gunshots and fled the scene.

Within five minutes of hearing the gunshots, Helger received a telephone call from the defendant, who asked her to pick him up on a street adjacent to Sunset Hill.  When Helger picked the defendant up, he instructed her to drive to Boston.

On the way there, the defendant told Helger that "[the victim] got shot, and that [the defendant] did what he had to do."  Additionally, he began to pray, and he instructed Helger

that, if asked, she should lie and say that they had left Fall River at 6 P.M. The defendant also told Helger to put her hands up if they were stopped by the police because the police would think that the defendant had "something on him" and he did not want Helger to get shot.

After arriving in Boston, Helger observed the defendant wiping blood off his face. The defendant then purchased new shoes at a store and threw the pair of shoes he had been wearing in a trash barrel. After visiting his brother at his brother's house, the defendant and Helger spent the night at a hotel in Boston.

The following day, Helger and the defendant traveled to his mother's house, where he destroyed the subscriber identity module located in his cellular telephone.

The police recovered a black, hooded sweatshirt with the victim's blood, along with a pair of gloves that tested positive for gunshot residue, on the sidewalk of a street near Sunset Hill. They also recovered, insofar as relevant here, twelve .223 caliber shell casings from the scene of the crime. It was later determined that the .223 caliber cartridge casings were fired from a Ruger Mini-14 rifle (rifle) recovered from the residence located in the Dorchester section of Boston.

At trial, Steve Smith, another Sunset Hill resident, identified the rifle recovered from the Dorchester residence as

the rifle that he had given to the defendant approximately two weeks before the shooting, in exchange for "crack" cocaine. Smith also gave the defendant multiple rifle magazines and numerous rounds of .223 caliber ammunition during that transaction.  Shortly after the shooting, the police executed a search warrant for the defendant's apartment and recovered, from the basement of a neighbor's unit that shared basement space with the unit in which the defendant was living, a rifle case, .223 caliber ammunition, and rifle magazines, which Smith identified at trial as having previously been his.

b.  The grand jury transcript.  While in prison awaiting trial, the defendant sent a letter to a relative, in which he requested that the recipient contact his sister in order to have her instruct his stepfather not to testify before the grand jury or at the defendant's trial.

The defendant attached six pages of grand jury transcript to the letter.  That transcript recounted the testimony of Detective John McDonald of the Fall River police department, who had interviewed the stepfather during the course of the investigation.  According to McDonald's grand jury testimony, the defendant told the stepfather that he shot the victim, then

took the victim's gun and shot him with that weapon, spit on the victim's face, and kicked him in the head.[2]

The defendant's letter and the attached grand jury transcript were intercepted, pursuant to an order, by a prison official.  The letter and grand jury transcript were subsequently admitted in evidence at trial.

2.  <u>Motions to suppress</u>.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of his ultimate findings and conclusions of law.'"  <u>Commonwealth</u> v. <u>Scott</u>, 440 Mass. 642, 646 (2004), quoting <u>Commonwealth</u> v. <u>Jiminez</u>, 438 Mass. 213, 218 (2002).

a.  <u>Evidence seized from the basement</u>.  The defendant first contends that evidence obtained from the basement unit of the apartment adjoining his was beyond the scope of a search warrant and therefore was improperly seized and admitted in evidence at trial.  The undisputed facts presented at the motion hearing are as follows.  Shortly after the death of the victim, the Fall River police department executed a search warrant.  The search warrant authorized the police to search unit 316 of Sunset Hill, which at the time was occupied by the defendant and Helger.

---

[2] The defendant explained in his letter that McDonald's testimony about what was said during the interview could not be used against the defendant in court unless the stepfather testified before the grand jury or at the defendant's trial, and therefore the stepfather should not do so.

During the execution of the warrant, police officers recovered a plastic bag containing two metal ammunition clips loaded with .223 caliber ammunition, and they also found loose .223 caliber ammunition rounds.  The police also recovered a rifle carrying case from the same area.  The defendant asserts (and the Commonwealth does not dispute) that these items were seized from the basement of unit 315, a neighbor's apartment, and were thus outside the scope of the warrant for the search of his apartment (unit 316), and seized in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.

In his motion to suppress, the defendant argued that he had automatic standing to challenge the seizure of the items.  The motion judge denied the motion as to the indictments charging the defendant with murder in the first degree and possession of a firearm, but allowed the motion as to the indictment charging him with possession of a large capacity feeding device.[3]  The defendant contends that once his standing to challenge the seized items was established with respect to the third

---

[3] General Laws c. 140, § 121, states that a large capacity feeding device is "a fixed or detachable magazine . . . capable of accepting . . . more than ten rounds of ammunition . . . ." The magazines seized from the basement of unit 315 of the Sunset Hill housing development (Sunset Hill) fit within this definition, as one contained twenty rounds of ammunition and the other contained twenty-one rounds of ammunition.

indictment, the items were required to be suppressed as to all indictments.  We disagree.

In Commonwealth v. Amendola, 406 Mass. 592, 601 (1990), we held that art. 14 incorporates the doctrine of automatic standing, even though the United States Supreme Court had previously abandoned the doctrine.  See United States v. Salvucci, 448 U.S. 83, 95 (1980). Thus, "[w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and the seizure of that evidence."  Amendola, supra at 601.

Here, the motion judge correctly determined that possession of the items seized from the neighbor's unit, while outside the scope of the warrant, was not an essential element to either the murder indictment or the indictment for the possession of the firearm the police had obtained by other proper means.  See G. L. c. 265, § 1; G. L. c. 269, § 10 (a).  The defendant therefore lacked automatic standing to challenge the illicit seizure of those items with respect to the first two indictments.  See Amendola, 406 Mass. at 601.

As the motion judge concluded, however, the defendant did have automatic standing to challenge the search and seizure (and consequently the admissibility) of those items with respect to

the third indictment (possession of large capacity feeding devices) and the seized rifle magazines qualified as such devices under the statute.  Therefore, the defendant argues, the seized ammunition and rifle magazines should not have been introduced in evidence at trial.  Our decision in Commonwealth v. Frazier, 410 Mass. 235 (1991), forecloses this argument.

In Frazier, the defendant was charged with both trafficking in cocaine, G. L. c. 94C, § 32E, and conspiracy to traffic in cocaine, G. L. c. 94C, § 40, after the police searched his codefendant's handbag and uncovered a large quantity of cocaine. Id. at 239, 244.  We held that the defendant had standing to challenge the search of his codefendant's handbag as to the trafficking charge because possession of the cocaine seized from the handbag was an essential element of that offense.  Id. at 245.  However, the defendant did not have standing to challenge the search as to the conspiracy charge because possession of the cocaine recovered from the handbag was not an essential element of that crime.  Id. at 245-246.

Accordingly, here the motion judge correctly determined that the defendant's standing to challenge the search of his neighbor's basement under the third indictment did not give the defendant standing to challenge the admission of the seized items at the trial of the other indictments.  Because the Commonwealth did not proceed against the defendant on the third

indictment, the only indictment that provided him with automatic standing, the defendant lacked standing to challenge the admission of the ammunition, rifle magazines, and rifle carrying case in evidence at the trial.[4,5]

b. <u>Prison letter and grand jury testimony</u>. The defendant next argues that a second motion judge erroneously deemed his motion to suppress the letter and attached grand jury transcript waived after the defendant failed to appear at the scheduled motion hearing. We agree.

Prior to trial, the defendant, representing himself, moved to suppress the letter and the attached grand jury transcript

---

[4] The defendant argues that the Commonwealth's failure to enter a formal nolle prosequi required the evidence seized from unit 315 of Sunset Hill to be suppressed at trial. A prosecutor has the discretion to enter a nolle prosequi of indictments pending against a defendant "at any time prior to the pronouncement of sentence." Mass. R. Crim. P. 16 (a), 378 Mass. 885 (1978). Although a nolle prosequi was not formally entered as to the third indictment until the defendant had been convicted and sentenced on the other indictments, the Commonwealth nevertheless chose not to prosecute the defendant, and that indictment was never presented to the jury. The defendant was never sentenced for the charge set forth in the third indictment; thus, the prosecutor's entry of a nolle prosequi as to that charge after trial was a valid exercise of prosecutorial power pursuant to Mass. R. Crim. P. 16 (a).

[5] There is no validity to the defendant's claim that statements made by the motion judge at the hearing on the motion to suppress "impinged upon the expectation of fundamental fairness in the judicial process." To the contrary, the motion judge merely stated the obvious -- that the Commonwealth had to decide whether to proceed on the third indictment in light of his ruling.

intercepted by the prison official on the basis that the official failed to follow Department of Correction (department) procedures while monitoring the defendant's mail. On the day of the motion hearing, a court officer stated that she had heard from the department that the defendant refused to be transported to the court house.[6] Standby counsel who was present at the scheduled hearing did not object to the judge's ruling that the motion was waived.

We previously have held that a defendant's absence at a motion hearing does not automatically constitute a waiver of the defendant's right to the suppression hearing itself, Robinson v. Commonwealth, 445 Mass. 280, 290 (2005). Accordingly, the motion judge in this case erred in denying the motion solely on the basis that the defendant had waived the claim by failing to appear. However, because we conclude that the motion would not have succeeded in any event, the denial of the motion did not create a substantial likelihood of a miscarriage of justice warranting a new trial. See Commonwealth v. Marquetty, 416

---

[6] The defendant was in the custody of the Commonwealth at the time of the motion hearing. The defendant disputes the claim that he refused to be transported. In his motion for postconviction discovery regarding the circumstances surrounding his failure to appear at the motion hearing, he alleges that his transportation vehicle had never arrived at the prison to bring him to the motion hearing. His motion for postconviction discovery was denied.

Mass. 445, 448 (1993), citing Commonwealth

v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992).

The defendant claims that his rights under the Fourth Amendment and art. 14 were violated when the prison officer seized his outgoing mail.  To establish such a violation, the defendant bears the burden of proving that, in the circumstances presented, the search and seizure falls within the purview of the Fourth Amendment and art. 14, that is, that he had a reasonable expectation of privacy in the items seized.  Commonwealth v. Silva, 471 Mass. 610, 617 (2015); Commonwealth v. D'Onofrio, 396 Mass. 711, 714-715 (1986).  To do so, the defendant must demonstrate both that he had a subjective expectation of privacy in the item and that the "expectation of privacy [is] one that society is prepared to recognize as 'reasonable.'"  Matter of a Grand Jury Subpoena, 454 Mass. 685, 688 (2009), quoting Commonwealth v. Blood, 400 Mass. 61, 68 (1987).

Here we need look no further than to whether the defendant can demonstrate a subjective expectation of privacy in his outgoing mail.  Whether an inmate has a subjective expectation of privacy generally turns on whether the inmate has notice of the policy of the penal institution allowing for the search or seizure of a particular item.  See Matter of a Grand Jury Subpoena, 454 Mass. at 689; Cacicio v. Secretary of Pub. Safety,

422 Mass. 764, 772-773 (1996); United States v. Van Poyck, 77 F.3d 285, 290 (9th Cir.), cert. denied, 519 U.S. 912 (1996). Here, the defendant does not even argue that he subjectively believed that his mail would not be monitored by prison personnel or that he lacked notice of the department's regulation authorizing prison personnel to monitor his mail. It is apparent that his motion would have failed.

3. Motion for a new trial. The defendant next argues that a third judge, who was also the trial judge, erred in denying his motion for a new trial after the jury were exposed to extraneous material during deliberations. We disagree.

"When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder . . . , we review both under G. L. c. 278, § 33E" (citation omitted). Commonwealth v. Chatman, 473 Mass. 840, 846 (2016), quoting Commonwealth v. Jackson, 471 Mass. 262, 266 (2015), cert. denied, 136 S. Ct. 1158 (2016). We first determine whether "the denial of the motion was based on an error of law or an abuse of discretion." Commonwealth v. Leng, 463 Mass. 779, 781 (2012). If we conclude an error was made, we then determine "whether such error creates a substantial likelihood of a miscarriage of justice." Id. Where, as here, the judge hearing a motion for a new trial was also the trial judge, we

extend special deference to her factual

determinations.  <u>Commonwealth</u> v. <u>Camacho</u>, 472 Mass. 587, 591

(2015), quoting <u>Leng</u>, <u>supra</u> at 781.

a.  <u>Magazine containing BB gun photographs</u>.  At the trial,

Helger, the defendant's girl friend, testified that she had

witnessed the defendant and his friend handling the murder

weapon in the weeks leading up to the shooting.  Near the end of

trial, the defendant questioned Detective Michael J. Chace, who

investigated the murder, about a conversation that Chace had

with the friend following the shooting.  Chace stated that he

had asked the friend whether he had seen the defendant with a

gun prior to the shooting, and the friend responded that he had

seen the defendant only with a BB gun shaped like a handgun.

Shortly after trial, standby counsel for the defendant was

contacted by a juror, who informed standby counsel that she was

troubled by the verdict.  Standby counsel promptly reported the

matter to the trial judge, and a hearing was held to determine

the substance of the exchange between standby counsel and the

juror.  The judge requested that the juror express her concerns

in writing, and she submitted a letter to the judge detailing

them.

In her letter, the juror stated that another juror brought

a magazine about BB guns, which apparently had pictures of BB

guns in it (BB gun magazine) and which was not introduced as

evidence at trial, into the jury deliberation room in order to show other jurors that certain BB guns look like real guns.[7]  The first juror's letter also stated that she had misunderstood both the manner in which MacDonald's grand jury testimony was to be used by the jury during deliberations and her ability to discredit the grand jury testimony.

On March 27, 2009, the defendant filed a motion for a new trial based on the information set forth in the juror's letter. The judge denied the motion after finding beyond a reasonable doubt that the defendant was not prejudiced by the jury's consideration of the extraneous material.  We agree with this conclusion.

In Commonwealth v. Fidler, 377 Mass. 192, 193-194 (1979), overruled on another ground by Commonwealth v. Moore, 474 Mass. 541 (2016), a juror presented an affidavit to the court in which the juror alleged that extraneous material not presented at trial had been considered by the jury during deliberations.  We held that the defendant was entitled to a hearing to determine whether extraneous material had been introduced into the jury

---

[7] The defendant and the Commonwealth both infer that the second juror brought the magazine into the jury deliberation room to reconcile the conflicting testimony given by Helger and Detective Michael J. Chace concerning whether the defendant had been seen possessing an actual gun or a BB gun before the murder.  While the first juror's letter discusses the testimony of Chace, it does not reference the testimony of Helger.

room, and, if so, whether a new trial was warranted due to resulting prejudice to the defendant. Id. at 200-201.

The first step of the Fidler inquiry requires the defendant to prove by a preponderance of the evidence that extraneous material was introduced to the jury. Id. at 201. See Commonwealth v. Kincaid, 444 Mass. 381, 386 (2005), quoting Fidler, supra. Here, the judge, in her memorandum of decision denying the defendant's motion for a new trial, assumed that extraneous material had reached the jury deliberation room, and moved on to the second prong of the Fidler inquiry. That second prong requires that the Commonwealth prove beyond a reasonable doubt that the jury's review of the extraneous material did not prejudice the defendant. Fidler, 377 Mass. at 201. When determining whether the defendant was prejudiced by the extraneous material, "the judge may not receive any evidence concerning the actual effect of the matter on the juror's decision . . . . Rather, the judge must focus on the probable effect of the extraneous facts on a hypothetical average jury." Id.

The judge found beyond a reasonable doubt that the jurors' examination of the BB gun magazine did not prejudice the defendant because "the case against the defendant was strong while the question of whether a BB gun can resemble a real gun was not attached to any crucial issue in this case." In coming

to this conclusion, the judge properly focused on the weight of evidence against the defendant, and the likelihood that the extraneous material prejudiced him.  See Kincaid, 444 Mass. at 389, quoting Fidler, supra at 201 n.8.

We agree with the judge's finding that the evidence against the defendant at trial was substantial.  Helger, the defendant's girl friend, testified to numerous inculpatory statements made and actions taken by the defendant immediately following the murder.  Her testimony also established the defendant's motive.

Further, Smith testified that he had given the defendant the rifle used to kill the victim in exchange for "crack" cocaine.  The police also recovered ammunition of the same caliber as that used in the murder, rifle magazines, and a rifle carrying case from the basement of the housing unit that adjoined the unit in which the defendant was living at the time of the murder.  At trial, Smith also identified those items as articles traded to the defendant in the same transaction.

Multiple eye witnesses also observed a person matching the description of the defendant fleeing the scene of the crime. One witness identified the shooter as the defendant based on his gait.  Another witness who had heard gunshots observed the shooter kick the victim, and Helger testified that the defendant disposed of his shoes on arriving in Boston on the night of the murder.  The victim was also seen falling onto the shooter after

the shots were fired on the night of the murder, and Helger testified that the defendant wiped blood off his face after they fled to Boston.

In addition to the substantial evidence of the defendant's guilt, the judge also correctly determined that the probability of prejudice was low with respect to the introduction of the BB gun magazine into the jury deliberation room, given that the question whether a BB gun can look like an actual gun was insignificant in determining the defendant's guilt.

The use of a BB gun magazine to resolve the discrepancy between Helger's testimony (about a gun she observed the defendant handling in the week before the murder) and what Detective Chace reported (that a friend of the defendant told Chace that the friend had witnessed the defendant handling a BB gun during that same time) was not significant, where the defendant's possession of the murder weapon was established through other evidence at trial.

Additionally, the conflicting testimony was not contradictory. Helger testified that she saw the defendant handling a rifle before the murder. Chace testified that a friend of the defendant told Chace that the friend had seen the defendant with a BB gun shaped like a pistol prior to the murder. The introduction of a BB gun magazine into the jury

room would not help a hypothetical jury resolve this incongruity between the testimony of Helger and Chace.

Finally, the Commonwealth's failure to highlight the fact that Helger observed the defendant with the rifle after extensively discussing her testimony in its closing argument further illustrates the insignificance of Helger's testimony in linking the defendant to the murder weapon.

For these reasons, the judge's determination that the defendant was not prejudiced by the introduction of the BB gun magazine into the jury deliberation room was not an abuse of discretion or other error of law.

The defendant further argues that he is entitled to a new trial because the judge learned, through the letter from the juror, that the jury were influenced by extraneous information.

As previously discussed, the judge requested that the juror submit her concerns to the court in writing. The letter, in pertinent part, states:

> "[The other juror] brought in a magazine about BB guns into the deliberation room on the second day of deliberation. He used this magazine to show other jurors that BB guns are similar in appearance to real guns. After one of the witnesses testified that he saw the Defendant with only a BB gun and not a real gun, [that juror] proceeded to inform the other jurors that the Defendant could have had a real gun as they look similar. He used this magazine to demonstrate this belief to the other jurors."

In Fidler, we stressed our reluctance to "prob[e] the juror's thought processes" in determining whether the defendant is entitled to a new trial after extraneous material was deemed to have been brought into the jury deliberation room. Fidler, 377 Mass. at 201. See Harrington v. Worcester, Leicester & Spencer St. Ry. Co., 157 Mass. 579, 581-582 (1893); Commonwealth v. Scanlan, 9 Mass. App. Ct. 173, 184 (1980). A judge hearing a motion for a new trial therefore "may not receive any evidence concerning the actual effect of the matter on the juror's decision" while conducting a hearing to determine whether extraneous material reached the jury deliberation room. Fidler, supra at 201.

In Kincaid, we recognized the inherent difficulty in conducting the hearing required by Fidler without inquiring into the jury's deliberative process. See Kincaid, 444 Mass. at 391-392. In order to reduce the likelihood that a juror will testify as to their "subjective mental processes" during deliberations, we clarified the extent to which juror testimony may be elicited by a judge hearing such a motion: jurors may testify as to information not mentioned at trial that came up during deliberations, but they cannot describe how that information was used or the manner in which it affected individual jurors' thought processes. Id. at 391, quoting Fidler, 377 Mass at 198.

Here, the judge conducted a hearing to determine the extent of the conversation between the juror and standby counsel, but a hearing was never conducted to determine whether the extraneous material in fact had been presented to the jury. Instead, the judge requested that the juror "express her concerns in writing." The judge then used what she gleaned from the letter to determine whether the introduction of the magazine was prejudicial to the defendant.

Neither party claims error with respect to the judge's method of inquiry, although it departs from the Fidler framework. See Fidler, 377 Mass. at 200-201 (defendant entitled to hearing in order to substantiate claim that extraneous material was considered by jury during deliberations). Nonetheless, Fidler gives a judge hearing a motion for a new trial latitude in conducting a postverdict inquiry. See id. at 203 (judge "may make such order as [she] deems appropriate for the administration of justice" when conducting postverdict inquiry). The judge determined that the juror's letter was sufficient to allow the judge to conduct a substantive analysis pursuant to Fidler, as evidenced by her memorandum denying the defendant's motion for a new trial. We agree and therefore perceive no error that creates a substantial likelihood of a miscarriage of justice.

However, by requiring the juror to reduce her concerns to writing without any guidance, the judge increased the likelihood that information about the jurors' thought processes during deliberations would come to light.  In her letter, the juror described the second juror's attempt to use the BB gun magazine to show other jurors that a BB gun may be similar in appearance to a real gun.  Nevertheless, the first juror did not go on to describe the actual effect that the introduction of this evidence had on the jury's deliberations.  She included no statement as to the impact of the extraneous material on any one juror's "subjective mental process" in coming to the conclusion that the defendant was guilty.  Contrast Commonwealth v. Cuffie, 414 Mass. 632, 638 (1993), overruled on another ground by Commonwealth v. Santoli, 424 Mass. 837 (1997) (defendant entitled to new trial after juror explicitly stated she was influenced by extraneous material considered during deliberations).  Because the juror's letter does not reveal the actual effect that the BB gun magazine had on any juror's ultimate conclusion of the defendant's guilt, the judge did not err in refusing to grant the defendant's motion for a new trial. Accordingly, the defendant's claim fails.

b.  Grand jury transcript.  At trial, the defendant, acting pro se, objected to the admission in evidence of the grand jury transcript of Detective McDonald's testimony that was attached

to the defendant's letter because the documents contained hearsay. The judge informed the defendant that the grand jury transcript was admissible despite the fact that McDonald was relaying to the grand jury statements made by the defendant's stepfather, because the transcript, coupled with the defendant's letter, constituted consciousness of guilt evidence. See Commonwealth v. Scanlon, 412 Mass. 664, 676 (1992), overruled on another ground by Commonwealth v. King, 445 Mass. 217, 242-243 (2005) ("It is well established that evidence regarding threats or intimidation of key witnesses for the prosecution is admissible to demonstrate consciousness of guilt").

Despite his initial objection, the defendant subsequently stipulated to the admission of the letter and grand jury transcript in exchange for the admission of a letter he sought to admit written by Helger (and intercepted by a prison official). Although the defendant was representing himself, the record indicates that standby counsel was available to him at sidebar when the stipulation was agreed to.[8]

After the Commonwealth read the stipulation aloud in the presence of the jury, the defendant did not object or request limiting instructions. Moreover, the defendant made no

---

[8] At the sidebar, standby counsel also actively made several suggestions regarding possible redactions from the material whose admission the defendant had stipulated to.

objection when the Commonwealth referenced the grand jury transcript and letter in its closing argument.  Finally, the defendant did not object to the jury instructions given at the close of trial.

In his motion for a new trial, the defendant argued that the letter and attached grand jury transcript were extraneous materials that were improperly considered by the jury during deliberations.[9]  The judge denied the motion after determining that the letter and grand jury transcript were not extraneous materials because the defendant stipulated to the admission of both documents.

On appeal, the defendant claims that the judge erred because he had not in fact stipulated to the admission of the letter and grand jury transcript.  The defendant further argues that the admission of the letter and the attached grand jury transcript in evidence constitutes reversible error because the materials contained hearsay, violated the confrontation clause, and were overly prejudicial to the defendant.

A defendant is bound by a stipulation that a document is admissible unless it is vacated as "improvident or not conducive to justice."  Commonwealth v. Sanchez, 405 Mass. 369, 377 (1989), citing Pastene Wine & Spirits Co. v. Alcoholic Beverages

_____

[9] The defendant was represented by appellate counsel when this motion was filed.

Control Comm'n, 401 Mass. 612, 615 (1988). In denying the defendant's motion, the judge found that the defendant had stipulated to the admission of the letter and grand jury transcript, and the record supports this conclusion. Instead of having the admission of the documents limited to their use as evidence of consciousness of guilt, the defendant made a strategic decision to stipulate to their general admission. See Scanlon, 412 Mass. at 676. In exchange for the admission of the defendant's letter and the grand jury transcript, the defendant was able to admit in evidence a letter that he received from Helger which he believed would be helpful to his case. Finally, the defendant's decision to agree to the stipulation appears to have led the Commonwealth to conclude that it no longer needed to call the defendant's stepfather as a witness.[10]

Nothing in the record indicates that the defendant's decision to stipulate to the admission of the letter and attached grand jury transcript was "improvident or not conducive to justice." Sanchez, 405 Mass. at 377, citing Pastene Wine & Spirits Co., 401 Mass. at 615. Although the grand jury transcript was damaging to the defendant, it would have been

_____

[10] The Commonwealth intended to call the defendant's stepfather as a witness during its case-in-chief. However, almost immediately after the stipulation was agreed to at sidebar, the Commonwealth stated that it no longer intended to call the stepfather as a witness.

damaging even if its admission had been limited to the jury's consideration of consciousness of guilt, and the defendant benefited from the stipulation in other respects. It also altered the way in which the Commonwealth presented its case to the jury. We discern no reason to set aside the defendant's stipulation with the Commonwealth.

Because the defendant entered into a valid stipulation with the Commonwealth, his other arguments regarding the admission of the grand jury transcript must fail.

Finally, the defendant uses the letter from the juror to argue that the jury improperly considered the grand jury transcript during deliberations.[11] However, where the transcript was admitted pursuant to a stipulation, and the defendant did not request a limiting instruction, the evidence was admitted for all purposes, Commonwealth v. Roberts, 433 Mass. 45, 48 (2000), and the juror's letter has no bearing on the validity of the verdict. Moreover, as the Appeals Court recognized in Commonwealth v. Delp, 41 Mass. App. Ct. 435, 440 (1996), the "second thoughts of a conscientious juror . . . do not in any way necessitate a new trial" (citations omitted). See United States v. Gerardi, 586 F.2d 896, 898 (1st Cir. 1978) (juror's

---

[11] The juror stated in her letter that she misunderstood both the manner in which the grand jury transcript was to be used during deliberations and her ability to discredit the contents of the grand jury transcript.

second thoughts about conviction do not compel new trial); United States v. Weiner, 578 F.2d 757, 764 (9th Cir.), cert. denied, 439 U.S. 981 (1978) (refusing to grant new trial after juror expressed second thoughts about verdict). The judge did not err in denying the defendant's motion for a new trial.

4. Evidentiary issues. The defendant also claims error relating to the admission of certain evidence at his trial. Because the defendant preserved the issues during trial, we determine whether there was error, and, if so, whether that error was prejudicial. Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

a. Chain of custody. The defendant argues that evidence was improperly admitted after defects in the chain of custody of the evidence were exposed.

Two paper evidence bags containing what was believed to be black gloves found near the scene of the crime were admitted in evidence at trial. During deliberations, the jury informed the judge that the bags were empty. Standby counsel moved to strike all testimony relating to the evidence. The judge, after consulting with standby counsel, the defendant, and the Commonwealth, instead informed the jury that the gloves were misplaced while in the custody of the Commonwealth. It was eventually discovered that the bags were improperly marked, and

that the gloves were in the custody of the State police crime laboratory. The gloves were not submitted to the jury.

Defects in the chain of custody of otherwise admissible evidence go to the weight of the evidence, as opposed to the admissibility of the evidence. Viriyahiranpaiboon, 412 Mass. at 230. The judge informed the jury that the Commonwealth misplaced the gloves, so that they could properly weigh the evidence before them. We perceive no error.

b. Testimony of immunized witness. The defendant argues that Smith, who testified to providing the defendant with the gun used in the shooting, improperly testified during trial as to his obligation to tell the truth pursuant to a grant of immunity.

On direct examination, when the Commonwealth asked whether his grant of immunity freed Smith to be less accurate with his testimony, Smith stated that it did not. Standby counsel objected to this testimony, but the objection was overruled.

In Commonwealth v. Ciampa, 406 Mass. 257, 265 (1989), we stated that "[a] prosecutor must be free to argue that [an immunized] witness is credible, but may not explicitly or implicitly vouch to the jury that he or she knows that the witness's testimony is true." In order to prevent a prosecutor from vouching as to an immunized witness's credibility, a

prosecutor should wait to bolster the credibility of the witness until redirect examination.  Id. at 264.

Here, the Commonwealth did not bolster the witness's credibility by questioning him concerning his obligation to tell the truth on direct examination.  The terms of the agreement between the Commonwealth and Smith were not presented to the jury, and the jury were not informed that the decision to immunize Smith was contingent on his testifying truthfully.  Contrast id. at 262 (error where portion of plea agreement presented to jury stating agreement contingent on witness's truthfulness not redacted).

Additionally, although not required to give the jury an immunized witness charge, the judge gave the such a charge after the Commonwealth concluded its direct examination of Smith and at the close of trial.  The defendant did not object to either charge as being insufficient during trial.  See Commonwealth v. James, 424 Mass. 770, 786-787 (1997) (immunized witness instruction not necessary where no testimony about grant of immunity being dependent on witness's truthfulness elicited).  We perceive no error.

c.  Testimony about domestic violence.  As discussed, on the day before the killing, the defendant had become upset after Helger allowed the victim to use her bathroom while the defendant was not home.  Helger testified that the defendant

pushed her against a wall during the course of their argument. She further testified that the victim criticized the defendant for doing so, which resulted in the defendant telling the victim to leave the apartment. The victim, armed with a gun, returned to the defendant's apartment and informed the defendant that he and Helger should leave the Sunset Hill development.

The defendant argues that Helger's statement that the defendant pushed her against a wall is evidence of domestic abuse, which is both irrelevant and overly prejudicial to the defendant. We disagree.

Because the defendant did not object to the testimony at trial, we review the claim of error to determine whether there is a substantial likelihood of a miscarriage of justice. Marquetty, 416 Mass. at 448. It is well established that evidence of prior bad acts and hostile relationships is admissible to prove the hostile nature of the relationship between a victim and a defendant. See, e.g., Commonwealth v. Bianchi, 435 Mass. 316, 322 (2001); Commonwealth v. Sarourt Nom, 426 Mass. 152, 160 (1997); Commonwealth v. Cordle, 404 Mass. 733, 744 (1989), S.C., 412 Mass. 172 (1992). Here, Helger's testimony was clearly relevant to demonstrate the contentious relationship between the defendant and the victim. Helger's testimony gave the jury information about the events leading up to the murder, which shed light on the defendant's

motive for committing the murder.  The inclusion of this testimony was not an error.

5.  Relief pursuant to G. L. c. 278, § 33E.  After reviewing the record in its entirety, we decline to exercise our powers under G. L. c. 278, § 33E, to grant the defendant a new trial or to reduce the degree of guilt.

Judgments affirmed.

Order denying motion for
a new trial affirmed.