SUPERIOR COURT 
 
 COMMONWEALTH VS. JOSE REYES

 
 Docket:
 1877CR00358
 
 
 Dates:
 November 17, 2020
 
 
 Present:
 Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AFTER A WARRANTLESS SEARCH (Paper No. 19)
 
 

             Defendant Jose Reyes ("Reyes") is charged with being a felon in possession of a firearm. He has moved to suppress a firearm and other evidence seized by, and statements that he made to, the police following his arrest on May 1, 2018, in Lawrence.
            On November 2, 2020, the Court conducted an evidentiary hearing on Defendant's Motion To Suppress Evidence After A Warrantless Search (Paper No. 19) ("Motion"). The Court heard testimony from Officer Robert Lakin ("Lakin") of the Lawrence Police Department, and it received in evidence two color photographs (Exhibits 1 and 2). The defendant did not testify and introduced no exhibits.
            Reyes argues that the police seized him in the constitutional sense without having reasonable suspicion or probable cause he committed a crime, and that the Court should suppress the evidence and his statements to police as illegal fruits of the illegal investigatory stop and arrest. The Commonwealth makes myriad arguments in opposing the Motion, including that Reyes abandoned the evidence and police would have inevitably discovered it given that a warrant was outstanding for Reyes' arrest.
                                                            Page 1 of 17
            As is explained below, after thorough consideration of the submissions and arguments of counsel, and the evidence presented at the hearing, the Motion is DENIED.
FINDINGS OF FACT 
            The Court makes the following findings, which are based on the credible evidence produced at the hearing and the reasonable inferences the Court has drawn from the evidence. The Court finds that the testimony of Lakin was truthful and accurate on the relevant and material points. Thus, the Court credits his testimony in its entirety.
            On the afternoon of May 1, 2018, Lawrence police received a complaint from an identified citizen who lived near Brook St. Park ("Park"). The citizen stated that there were several men sitting on the basketball court inside the Park with dice and a hookah nearby, and they were gambling and smoking marijuana at the basketball court.
            At 1:50 PM, Lawrence police dispatched then-officer Lakin to the Park in response to the citizen complaint.[1] Lakin had been a patrol officer for approximately 41A years. He was very familiar with the Park and the surrounding area. Lakin was in full uniform. His badge and gun were visible. Lakin was operating a marked police cruiser and was working alone. At the time, he understood that gambling in a public place, such as a park, is illegal and would subject persons to arrest if it occurred in his presence.
            The Park is located in a mixed residential and commercial area, and is bordered on at least one side by the rear of homes located on Brooks Street. The Park has a parking area, a basketball court, a children's playground area adjacent to the basketball court, and a large field with gazebos. A gated, chain link fence encloses the basketball
---------------------------
[1] Lakin has since been assigned to the Street Narcotics Unit as a detective. However, the Court will refer to him herein as an "officer," the title he used on the date of incident.
                                                            Page 2 of 17
court. A section of this fence, which is well over six feet in height, separates the parking area and the basketball court.[2]
            Lakin had made arrests inside the Park in the past for robberies and drug distribution. In fact, Lakin had responded to more than 100 calls for police service at the Park and the immediate vicinity. He considered it one of the highest crime areas in the City of Lawrence. Lakin was also aware that there had been two shootings in or near the Park within the prior month.
            The lights on Lakin's marked police cruiser were flashing and the siren was on upon his arrival at the Park. Lakin parked his vehicle facing the basketball court. Lt. Guerrero ("Guerrero"),[3] who was in full uniform, arrived in an unmarked police vehicle as Lakin exited his cruiser. Upon exiting, Lakin observed a group of approximately five males sitting on a park bench inside the basketball court (i.e., the group of males was sitting on the other side of the aforementioned chain link fence that is between the parking area and the basketball court). He observed dice and a hookah on the ground directly in front of the men, approximately one to two feet away. The hookah had smoke coming out of it.[4]
---------------------------
[2] Lakin did not describe the height of the fence. However, the fence is depicted in two color photographs submitted in evidence by the Commonwealth and appears to be well over 6' in height.
[3] The parties did not provide the Court the first names or the spelling of the last names of Lt. Guerrero and other responding officers. Thus, the Court has spelled their last names phonetically herein.
[4] Lakin described a hookah as a large water pipe with hoses used to smoke marijuana and tobacco.
                                                            Page 3 of 17
            Lakin saw another male, later identified as Reyes, sitting approximately 18 to 20 feet beyond the group of males with the dice and hookah. Reyes was sitting alone on a park bench inside the basketball court area approximately 40 yards away from Lakin (i.e., Reyes was on the other side of the aforementioned chain link fence that separates the parking area and the basketball court). He looked at Lakin and immediately put a black backpack on his shoulder and began to run away. Reyes ran through an opening in the fence to the basketball court, near the kids' playground area. He ran away at full speed, "like his life depended on it," and Lakin pursued him. Lakin had not said anything to Reyes or the group of males. In fact, Lakin did nothing more than exit the cruiser and look toward the basketball court before Reyes fled.
            The group of males looked in Reyes' direction, but stayed seated on the bench inside the basketball court. None of them ran. Lakin did not speak to any of them.
            Lakin ran after Reyes because he found Reyes' reaction to his arrival at the Park to be "suspicious." Based on his training and experience, Lakin had a "hunch" that Reyes had a gun or drugs inside the backpack. At the time of the encounter, Lakin did not know Reyes and did not know there was a warrant outstanding for Reyes' arrest. Further, Lakin had not seen Reyes smoke marijuana, use dice, engage in any other criminality in the Park, or communicate in any way with the group of males on the closer park bench.
            Reyes ran toward the field and gazebo area in the Park, in the direction of the back of homes on Brooks St. that abut the Park. Reyes was about 40 — 50 yards away from Lakin when Lakin saw Reyes climb over a 6' wooden stockade fence that was at the rear of a home on Brooks St., adjacent to the Park. The fence had signs on it that
                                                            Page 4 of 17
said "No Trespassing" and "Private Property." Reyes broke off a piece of the top of a picket on the fence as he jumped over it. He still had the backpack on his shoulder.
            Lakin lost sight of Reyes after he jumped over the 6' stockade fence. Lakin was alone when he ran after Reyes and remained alone while in pursuit until he met up with other responding officers on Brooks Street.[5]
            Lakin never identified himself to Reyes or told him to stop because Reyes was too far ahead of him. While he was giving chase, Lakin broadcast a description of Reyes and the direction in which he was running. Reyes was wearing red basketball shorts, a gray tank top, and had "distinct" long hair.
            In the meantime, approximately seven officers responded to the area of Brooks Street. All responding officers were in full uniform. Lakin heard police sirens from the arriving police vehicles as he pursued Reyes.
            Shortly after Lakin lost sight of Reyes at the 6' stockade fence, a detective broadcast over the police radio that he saw Reyes run onto Brooks St. and Reyes did not have a backpack. Lakin ran onto Brooks St. and observed Reyes run toward Milford Street. Reyes was no longer carrying the backpack. Lakin heard officers yelling at Reyes to stop when Reyes was running on Brooks St. in the direction of Union St. The responding officers essentially surrounded the Park and had Reyes hemmed in.
---------------------------
[5] In his post-hearing memorandum, Reyes asserts, "both Officer Lakin and Lt. Guerrer[o] pursued" him. This assertion may be based on Lakin's affirmative answer to the following compound question posed by defense counsel: "Now, you and Lt. Guerrero, at that point in time, have no conversation with the four or five people, you both take off running after Mr. Reyes, is that correct?" Notwithstanding Lakin's affirmative answer to this fleeting question, the evidence is clear that Lakin was the only officer that pursued Reyes from the basketball court and no other officers joined in the pursuit until after Reyes jumped over the 6' stockade fence. Moreover, the evidence is equally clear that neither Lakin nor Guerrero moved toward Reyes' direction before he ran from the basketball court, as Reyes contends.
                                                            Page 5 of 17
            Reyes ran onto Milford St., then onto Union St. He jumped over an 8' chain link fence behind 155 Union St., and then ran back onto Milford Street. Officer Fabian, who was in full uniform, arrested Reyes on Milford St. and placed him in handcuffs. This was approximately three to five minutes after Reyes first fled from Lakin at the Park.
            While police were chasing Reyes, Sgt. Martinez broadcast over the police radio that he found a backpack in a backyard near 31 Brooks Street. Lakin and Sgt. Martinez went to that backyard and observed Reyes' black backpack laying on the ground, just inside the 6' stockade fence on the other side of the area where Lakin earlier observed Reyes jump over and break a piece of the fence.
            Lakin brought the backpack to the area where Reyes was under arrest. He opened the backpack in Reyes' presence and found an unloaded 25 cal. firearm, a phone charger, an electronic vape, and personal papers containing Reyes' name.
            Officer Lakin then read Miranda warnings to Reyes from a card he carries. Reyes understood the Miranda warnings. Officers ran Reyes for warrants and found that there was a warrant outstanding for his arrest issued by Essex Superior Court in a case charging him with assault and battery and carrying a firearm without an FID card. Officers also learned Reyes had neither an FID card nor a license to carry a firearm.
            Lakin placed Reyes in the rear of his cruiser. On the ride to the police station, Reyes, without being questioned or prompted, stated that when he was running away, he saw that the door of one of the responding police vehicles was open and he contemplated entering the police car and driving away.
                                                            Page 6 of 17
CONCLUSIONS OF LAW
            As stated, Reyes argues that the items inside the backpack and his statements6 to police should be suppressed because police seized him in a constitutional sense at a time when police lacked reasonable suspicion or probable cause to believe he committed a crime.
            For its part, the Commonwealth contends that when Lakin pursued Reyes after he fled from the basketball court, Lakin had reasonable suspicion Reyes committed the crime of public gambling (gaming). Alternatively, the Commonwealth argues that, if the police lacked reasonable suspicion when they initially seized Reyes, police developed probable cause to arrest Reyes for trespassing and wanton destruction of property during the pursuit. The Commonwealth further contends that the seizure and search of the backpack by police was permissible because Reyes abandoned the backpack, and the police would have inevitably discovered the firearm and Reyes' statements because there was a warrant outstanding for his arrest.
I. POLICE SEIZED REYES IN THE CONSTITUTIONAL SENSE AT THE  POINT AT WHICH OFFICERS SHOUTED FOR HIM TO STOP AFTER  HE DISCARDED THE BACKPACK
            The Court must first address whether police seized Reyes in a constitutional sense and, if so, when. "The seizure inquiry . . . protects the right to be free from unreasonable seizures under the Fourth Amendment and art. 14." Commonwealth v.  Evelyn, 485 Mass. 691, 698 (2020) (citation omitted). "Under art. 14, a seizure occurs when an officer, 'through words or conduct, objectively communicate[s] that the officer
---------------------------
[6] Reyes argues that the Court should suppress the statements as fruits of an illegal seizure. He conceded at the hearing that he voluntarily, knowingly and intelligently waived his Miranda rights, and that he made the statements voluntarily.
                                                            Page 7 of 17
would use his or her police power to coerce [an individual] to stay.' . . . [T]he officer's actions [are interpreted] based on the totality of the circumstances surrounding the encounter." Id. at 696 — 697 (internal and external citations omitted).[7] Therefore, the Court must use an objective standard to determine whether (and when) police seized Reyes. Id. at 701. "[T]he analysis 'must arise from the actions of the police officer,' and not from [Reyes's] state of mind." Id. (citation omitted). An objective standard is used "so that officers can 'determine in advance whether the conduct contemplated will implicate the Fourth Amendment' or art. 14." Id. (citations omitted).
            At bottom, the seizure "inquir[y] attempt[s] to ascertain whether, considering the totality of the circumstances, an individual has been compelled to interact with the police." Id. at 698 (citation omitted).
            Lakin pulled into the parking lot at the Park in a marked police cruiser with the lights flashing and the siren sounding. The SJC has held that the activation of a police cruiser's lights and siren during an encounter with a motor vehicle may be a seizure in the constitutional sense. Commonwealth v. Smioliano, 427 Mass. 490, 491 — 492 (1998). "In contrast, 'the initial appearance of a cruiser with lights and sirens already activated does not necessarily send a message to stop' to any particular person on the scene." Commonwealth v. Werner, 73 Mass. App. Ct. 97, 104 (2008) (citation omitted) (emphasis added).
---------------------------
[7]"'[Article] 14 provides more substantive protection than does the Fourth Amendment in defining the moment' of seizure. . . . Accordingly, [the Court] analyze[s] the seizure under 'the more stringent standards of art. 14 with the understanding that, if these standards are satisfied, then so too are those of the Fourth Amendment.- Evelyn, 485 Mass. at 697 (2020) (internal and external citations omitted).
                                                            Page 8 of 17
            Here, although the cruiser's lights were flashing and the siren was sounding when Lakin arrived and exited the cruiser, that information did not send a message to Reyes to stop. Reyes was sitting a considerable distance (i.e., 40 yards) away from Lakin and the cruiser, on the other side of a tall fence, and there was a group of men clearly apart from Reyes that were between Reyes and Lakin whom appeared to have been engaging in illegality and who were Lakin's initial focus of attention.
            Upon seeing Lakin, Reyes immediately placed the backpack over his shoulder and ran away at full speed. Lakin pursued him. However, "merely running after a running person, without more, does not effect a seizure in the constitutional sense." Commonwealth v. Perry, 62 Mass. App. Ct. 500, 502 (2004). Further, no seizure occurred when Lakin initially pursued Reyes because "[Reyes'] flight was not prompted by anything the police did" and "[t]here was no evidence that the police exercised any show of authority or commanded the defendant to stop." Commonwealth v. Franklin, 456 Mass. 818, 823 (2010); see also Commonwealth v. Jones-Pannell, 472 Mass. 429, 433 (2015) (the defendant, who was walking on a sidewalk, increased his pace when police pulled up in an unmarked police vehicle and twice asked to speak to him; he then "started to run when the officers got out of the vehicle, one officer called out loudly to '[w]ait a minute,' and the officer then gave chase"; defendant seized in constitutional sense when officer called "wait a minute.").
            Furthermore, no seizure occurred when Lakin alone continued to pursue Reyes from a distance of 40 or 50 yards because Lakin did not do anything to make Reyes "plainly [ ] the object of an official assertion of authority that d[id] not intend to be
                                                            Page 9 of 17
denied." Commonwealth v. Lopez, 451 Mass. 608, 612 n.2 (2008) (citing Commonwealth v. Sykes, 449 Mass. 308, 313 (2007)).
            Lakin's fellow officers did not join in the pursuit until after Reyes jumped over the 6' stockade fence, landed in a backyard, and ran through the backyard onto Brooks St., leaving the backpack behind in the backyard. There, on Brooks St., other officers joined in the pursuit for the first time and yelled "stop" to Reyes for the first time. It was at that point, on Brooks St., when the police first exercised a show of authority via the joining of several officers in the pursuit and the commands to stop, that the police first effected a seizure of Reyes in the constitutional sense.
II. POLICE DID NOT HAVE REASONABLE SUSPICION TO CONDUCT  AN INVESTIGATORY STOP OF REYES 
            "An investigatory stop is justified only if the police have reasonable suspicion to conduct the stop. . . . Reasonable suspicion exists when an officer, based on specific, articulable facts and reasonable inferences therefrom, in light of the officer's experience, has reasonable grounds to suspect 'a person is committing, has committed, or is about to commit a crime." Commonwealth v. Pinto, 476 Mass. 361, 363 - 364 (2017) (internal and external citations omitted). Therefore, the Court must next address whether police had specific, articulable facts to believe Reyes had committed a crime when officers first seized Reyes in a constitutional sense when they joined in the pursuit and ordered Reyes to stop on Brooks St.
            The Commonwealth argues that Lakin had reasonable suspicion to believe Reyes committed the crime of gaming (gambling) in a public place, in violation of G.L. 271, § 2, based on the citizen's complaint, the Park being in a high crime area, and
                                                            Page 10 of 17
Reyes' sudden flight from Lakin at full speed ("as if his life depended on it"). The Court disagrees.
            Leaving aside whether the citizen's complaint of public gambling at the park was sufficiently reliable, see Commonwealth v. Manha, 479 Mass. 44, 46 (2018), the police may have had reasonable suspicion that the group of males sitting on the park bench inside the basketball court were engaged in illegal public gaming given that the dice were nearby. However, as stated, Reyes was clearly sitting apart, and 18 — 20 feet away, from this group of males. There was no evidence that Reyes was illegally gambling or even with the group of males sitting near the dice.
            With respect to the Park being in a high crime area, "[t]he characterization of an area as 'high crime' cannot justify the diminution of the civil rights of its occupants. . . . To guard against this risk, [a court should] consider this factor only if the 'high crime' nature of the area has a 'direct connection with the specific location and activity being investigated." Evelyn, 485 Mass. at 709 (internal and external citations omitted). Here, Lakin testified that there were two shootings in or near the park in the month before his encounter with Reyes, and that he had made arrests in the park for robberies and drug distribution. However, like the SJC in Evelyn, this Court is "skeptical that these previous crimes, without additional details, demonstrate a 'direct connection' with the defendant or the [alleged illegal public gaming] at issue, so [it] do[es] not consider the 'high crime' nature of the area in [its] analysis." Id.
            As for Reyes's sudden flight at full speed upon seeing Lakin, the Court is mindful that "evasive conduct in the absence of any other information tending toward an individualized suspicion that the defendant was involved in the crime is insufficient to
                                                            Page 11 of 17
support reasonable suspicion." Commonwealth v. Warren, 475 Mass. 530, 538 (2016) (citations omitted). Here, Lakin admittedly only had a "hunch" that there was contraband in the backpack at the time Reyes ran away, albeit a hunch based on Lakin's experience as an officer that people that ran from him in the past "usually" were in possession of contraband or had outstanding warrants. However, a hunch is not reasonable suspicion.
            In sum, prior to their seizure of Reyes via the officers' joining in the pursuit and command to "stop" on Brooks St., the police lacked "'reasonable suspicion, based on specific and articulable facts, that [he] had committed, was committing, or was about to commit a crime." Evelyn, 485 Mass. at 704 (citations omitted).
III. POLICE DID NOT HAVE PROBABLE CAUSE TO BELIEVE REYES  COMMITTED TRESPASSING OR WANTON DESTRUCTION OF  PROPERTY
            The Commonwealth next argues that police "developed" probable cause to arrest Reyes for trespassing and wanton destruction of property when Reyes jumped over the 6' stockade fence during the police pursuit. The Court disagrees.
            Reyes' flight over the 6' stockade fence containing "No Trespassing" and "Private Properly' signs did not provide Lakin with probable cause to believe Reyes committed the crime of trespassing in violation of G.L. c. 266, § 120. "The criminal trespass statute provides in pertinent part that '[w]hoever, without right enters or remains in or upon the ... improved or enclosed land ... of another, ... after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, ... shall be punished." Commonwealth v. Grayson, 96 Mass. App. Ct. 748, 756 (2019) (quoting G.L. c. 266, § 120) (emphasis added) (affirming trespassing
                                                            Page 12 of 17
conviction where "the defendant climbed over a five- or six-foot wooden fence, breaking it in the process, to enter another back yard.").
            "Probable cause exists when police know of 'enough facts and circumstances to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime." Commonwealth v. Maria, 97 Mass. App. Ct. 490, 494 (2020). "'[A]n objective test is used to determine whether probable cause exists." Commonwealth v. Arias, 481 Mass. 604, 617 (2019) (citations omitted).
            As stated, the police first seized Reyes in a constitutional sense after he jumped over the 6' stockade fence. At that time, the police had no information regarding whether or not Reyes had the right to enter the backyard enclosed by the 6' stockade fence because, for e.g., he resided or worked there. Although it is true that "'[i]n dealing with probable cause ... we deal with probabilities," Maria, 97 Mass. App. Ct. at 494 (citations omitted), the police here lacked probable cause to believe that the backyard was the property "of another" in violation of G.L. c. 266, § 120.
            The Commonwealth also argues that the police developed probable cause to believe Reyes committed the crime of wanton destruction of property, in violation of G.L. c. 266, § 127, when he broke the top of a picket on the 6' stockade fence when jumping over it. However, like the crime of trespassing, the police lacked probable cause to believe that Reyes did not own the fence. See G.L. c. 266, § 127 ("Whoever destroys or injures the personal property, dwelling house or building of another . . . if such destruction or injury is wanton, shall be punished.") (emphasis added).
                                                            Page 13 of 17
            In sum, the police had neither reasonable suspicion nor probable cause to believe Reyes had committed a crime when police first seized Reyes via the officers' show of force and commands to Reyes to "stop" on Brooks Street. However, the backpack stands on different constitutional footing.
IV. THE DEFENDANT HAD NO REASONABLE EXPECTATION OF PRIVACY IN THE LOCATION WHERE THE BACKPACK WAS FOUND  AND IN THE BACKPACK, ITSELF
            The Commonwealth next argues that Reyes no longer had an expectation of privacy in the backpack when he abandoned it after jumping over the 6' stockade fence. The Court agrees.
            "'Under both the Federal and Massachusetts Constitutions, a search in the constitutional sense occurs when the government's conduct intrudes on a person's reasonable expectation of privacy." Commonwealth v. Mora, 485 Mass. 360, 364 (2020) (quoting Commonwealth v. Augustine, 467 Mass. 230, 241 (2014)). "An individual has a reasonable expectation of privacy where (i) the individual has 'manifested a subjective expectation of privacy in the object [or place] of the search,' and (ii) 'society is willing to recognize that expectation as reasonable' . . .The defendant bears the burden of establishing that the governmental conduct violated his or her reasonable expectations of privacy." Commonwealth v. Johnson, 481 Mass. 710, 715 (2019) (citing Commonwealth v. Miller, 475 Mass. 212, 219 (2016)) (internal citations omitted) (emphasis added).
            Here, Reyes failed to prove he had a reasonable expectation of privacy in the location (i.e., backyard) where police recovered the backpack. Commonwealth v.  Carter, 424 Mass. 409, 412 (1997) (ruling that "Article 14 does not relieve a defendant
                                                            Page 14 of 17
who unlawfully intruded on someone else's reasonable expectation of privacy from establishing that he had a reasonable expectation of privacy himself" in case where defendant concealed bag of cocaine in a second floor porch while visiting an occupant of a first floor apartment). He discarded the backpack in a backyard of a home on Brooks St. after jumping over a 6' stockade fence containing signs that said "No Trespassing" and "Private Property." Reyes presented no evidence that shows he had a possessory or ownership interest in the backyard. Therefore, he failed to prove that police "conduct violated his [] reasonable expectations of privacy" when they seized the backpack. Johnson, 481 Mass. at 715.[8]
            Moreover, Reyes abandoned the backpack in the constitutional sense. "Where an individual abandons property, he or she retains no reasonable expectation of privacy in that property under the Fourth Amendment." Commonwealth v. Perkins, 465 Mass. 600, 606 (2013) (citing California v. Greenwood, 486 U.S. 35, 40-41 (1988)). "Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts." Commonwealth v. Paszko, 391 Mass. 164, 184 (1984) (citation omitted).
            The case of Commonwealth v. Games, 81 Mass. App. Ct. 713 (2012), is instructive on the issue of abandonment. There, the defendant was charged with shooting (and murdering) someone at a gas station. Id. at 714. While fleeing the scene on foot, the defendant hid a backpack he was carrying in bushes behind a shed in the nearby backyard of his best friend. Id. at 714 — 715. A neighbor alerted police to the
---------------------------
[8] Reyes bears the burden to show a possessory or ownership interest in the backyard, unlike when, as stated previously, the Commonwealth bears the burden to establish reasonable suspicion (or probable cause) to believe Reyes committed the crimes of trespassing and destruction of property.
                                                            Page 15 of 17
backpack. Id. at 714. Police recovered the backpack, unzipped it and observed a firearm. Id. at 715. In affirming the trial court's ruling that the defendant abandoned the backpack, the Appeals Court "focus[ed] on whether the defendant's subjective expectation of privacy 'could be considered objectively reasonable or legitimate." Id. at 716 (citation omitted). The Appeals Court "[f]irst, [consider[ed] that the defendant concealed his backpack outside, in a back yard in which 'by law, he had no reasonable expectation of privacy.' . . . He was neither the owner nor did he establish any right of control over the property." Id. at 716 (internal citation and ellipsis omitted). The Appeals Court next considered that "the defendant's handling of the backpack did not evince a legitimate expectation of privacy. The very manner by which he threw it behind the shed contravenes any reasonable inference that he took normal precautions to maintain his privacy." Id. at 717. In weighing these two factors, the Appeals Court found that "the defendant's act of hiding his backpack in the bushes in his best friend's yard without establishing that he placed the backpack in someone else's control, while he was trying to avoid apprehension, and in particular, while he was in possession of a handgun, fails to evoke an expectation of privacy that society is willing to recognize as reasonable." Id. at 717 — 718 (citation omitted).
            In the instant case, like the defendant in Carnes, Reyes abandoned the backpack in the constitutional sense. He ran away from police at full speed without any prompting by the police, jumped over a 6' stockade fence, landed in clearly designated private property, and dropped the backpack he was carrying in an effort to avoid apprehension while in possession of a firearm (and while being the subject of an arrest warrant). This
                                                            Page 16 of 17
conduct "fails to evoke an expectation of privacy that society is willing to recognize as reasonable." Id. at 718 (citation omitted).
            Therefore, the Motion is DENIED because Reyes abandoned the backpack, and the police had the right to open it and arrest him for illegally carrying the firearm.[9]
ORDER
            For the above reasons, it is HEREBY ORDERED that Defendant's Motion To Suppress Evidence After A Warrantless Search (Paper No. 19) is DENIED.
/s/Jeffrey T. Karp Associate Justice, Superior Court
November 17, 2020
---------------------------
[9] It is not necessary for the Court to address the Commonwealth's argument that, because Reyes was the subject of an arrest warrant, police would have inevitably discovered the firearm as a search incident to arrest or pursuant to an inventory search. However, the Court doubts that "discovery [of the firearm] by lawful means was 'certain as a practical matter.- Commonwealth v. Perrot, 407 Mass. 539, 547 (1990) (citation omitted). The backpack was recovered a good distance from where Reyes was arrested. Therefore, the backpack could not have contained a weapon "the defendant might use to resist arrest or escape," Commonwealth  v. White, 469 Mass. 96, 100 (2014), which would have justified a search of the backpack incident to arrest. Further, the search of the backpack was likely investigatory in nature rather than to protect Reyes personal property pursuant to an inventory policy. Commonwealth v.  Mauricio, 477 Mass. 588, 595 (2017).
                                                            Page 17 of 17
xxz