SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. LEE MANUEL RIOS

 
 Docket:
 SJC-12982
 
 
 Dates:
 December 6, 2024 - May 14, 2025
 
 
 Present:
 Present: Budd, C.J., Gaziano, Kafker, Wendlandt, & Dewar, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Homicide. Firearms. Practice, Criminal, Loss of evidence by prosecution, Preservation of evidence, Discovery, Voir dire, Jury and jurors, Motion to suppress, New trial, Capital case. Evidence, Expert opinion, Exculpatory, Scientific test, Guilty plea, Sound recording. Witness, Expert. Cellular Telephone. Due Process of Law, Loss of evidence by prosecution. Constitutional Law, Search and seizure, Imprisonment. Search and Seizure, Incarceration, Expectation of privacy. Imprisonment, Safe environment. Jury and Jurors.
 
 

             Indictments found and returned in the Superior Court Department on June 5, 2015.
            A pretrial motion to suppress evidence was heard by Constance M. Sweeney, J.; the cases were tried before Mark D. Mason, J., and a motion for a new trial, filed on August 5, 2022, was heard by him.
            James A. Reidy for the defendant.
            Travis H. Lynch, Assistant District Attorney, for the Commonwealth.
            Maithreyi Nandagopalan, of New Mexico, & Radha Natarajan, for New England Innocence Project & another, amici curiae, submitted a brief.
            KAFKER, J.  At approximately 2:30 A.M. on March 24, 2015, Kenneth Lopez was shot and killed on Dwight Street in Springfield.  His body was discovered the following morning by an area resident.  The defendant, Lee Manuel Rios, was arrested in connection with Lopez's death nine days later.  A grand jury returned twelve indictments in June 2015, charging the defendant with murder, conspiracy to commit murder, and several firearms offenses.  In February 2018, a jury convicted the defendant of murder in the first degree with extreme atrocity or cruelty and with deliberate premeditation.  He was sentenced to life in prison without the possibility of parole.
            The defendant now appeals from his convictions; from the denial of his motion to suppress mail intercepted by the jail facility in which he was detained pretrial; from the denial of his posttrial motion for a new trial, addressing multiple issues including the use of "ShotSpotter" technology to identify the location of the shooting; and from the denial of an evidentiary hearing on that posttrial motion.  In the alternative, the defendant seeks relief pursuant to our extraordinary power under G. L. c. 278, § 33E.  Finally, in light of our decision in Commonwealth v. Guardado, 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024) (Guardado II), the defendant seeks a new trial on several of his firearms convictions.
            We discern no reason to exercise our extraordinary power under G. L. c. 278, § 33E, to grant a new trial or reduce the defendant's conviction of murder in the first degree to a lesser degree of guilt.  The defendant is entitled to a new trial relative to his convictions for violations of G. L. c. 269, § 10 (a) and (h).  For the reasons discussed infra, we affirm the defendant's convictions of murder in the first degree and of the other firearm offenses and the orders denying both his pretrial motion to suppress and posttrial motion for a new trial.[1]
            1.  Background.  a.  Facts.  We summarize the facts as the jury could have found them, reserving certain details for our discussion.
            i.  Discovery of the victim.  Shortly after 10 A.M. on March 25, 2015, a Springfield resident came upon the body of the victim, Kenneth Lopez, in the alley next to the resident's home on Dwight Street.  The resident called for police, who confirmed the victim was unresponsive and noticed a small hole in the victim's neck below his right ear.  A crime scene identification officer dispatched to the scene observed that the victim's body "appeared to be almost frozen" and "was stuck to the ground" in such a way that several people were needed to remove the body from the ice on which it lay.  The body of the victim was transported to the medical examiner's office.
            Based on her autopsy of the body on March 26, the medical examiner determined that the victim's cause of death was multiple gunshot wounds.  The medical examiner documented five gunshot wounds:  an entrance wound on the right side of the victim's face; an entrance wound and an exit wound on the victim's right upper arm; an entrance wound on the outer part of the victim's right thigh; and an entrance wound on the back of the victim's neck.  Each of the three projectiles recovered from the victim's body, as well as a fourth projectile recovered on scene a few feet from the victim, were consistent with .38 caliber ammunition.
            ii.  Timeline.  We summarize here the complicated series of events leading up to and following the victim's death, expanding as necessary in our discussion infra.
            A.  Precipitating events and death.  The victim and the defendant had a history of interpersonal conflict and, around the time of the victim's death, grievances over money and a former girlfriend of the defendant.  The two had many associates in common, including Jonathan Guevara, Nathan Guevara, Valerie Medina, Darrell Self, and Natalie Rivera.[2]  The victim, the defendant, Jonathan, Nathan, and Self were members of the Latin Kings street gang.
            On the evening of March 21, 2015, the defendant, Jonathan, Nathan, Self, and Natalie attended a party at Medina's home on Jefferson Avenue in Springfield.  At some point, two members of La Familia, a rival street gang to the Latin Kings, arrived at Medina's home.  After a conflict broke out, the La Familia members left Medina's home but stated that they felt disrespected and "would be back."  The defendant and his associates took this statement as "either fighting words or shooting words" and left in Medina's car in search of firearms.
            While in the car with the defendant, Nathan, Self, Natalie, and Medina, Jonathan called the victim and requested that he provide the group with firearms.  In what was considered a serious breach of the Latin Kings' rules, the victim refused and told the group to "get their own fucking hammies."  To address the victim's apparent transgression, the defendant called a higher-ranking member of the Latin Kings, known as "King Flo," and requested a meeting the next day.
            At the March 22 meeting at King Flo's home, the defendant and the victim got into an altercation, in which the victim ultimately "pulled out a gun on" the defendant in front of King Flo's child.  Upset, the defendant demanded that King Flo remove the victim from the Latin Kings, or "[the defendant was] going to handle it his way."  Later that day, the defendant called the victim's uncle, explained the conflict, and stated that he was "going to kill" the victim.
            On March 23, the defendant enlisted several of his associates to ambush the victim near a neighborhood park.  The defendant met with Jonathan, Nathan, and Self at Medina's home, where the group devised a plan to "rob" the victim with a shotgun.  While later testifying at trial, Self described the plan as a robbery but clarified that the victim was not "meant to walk away from this robbery."  Likewise, Nathan testified that the encounter was intended to be "a killing," rather than a robbery.
            Later that day, the defendant, Jonathan, Nathan, Medina, Self, Natalie, and a person referred to as "Quala" drove to the home of Michael Rivera, another member of the Latin Kings.[3]  A shotgun was stowed in the trunk of the car, where it could be accessed by pulling down the car's back seat.  The defendant directed Michael to set up a marijuana transaction with the victim near Michael's home.  When Michael called the victim, however, the victim stated that he was "too drunk" and declined to come over.  The defendant and his associates then went their separate ways for several hours.
            That evening, Jonathan called the victim and, after an argument ensued, threatened to "shoot up" the victim's home, where the victim lived with his mother and his girlfriend.  Meanwhile, the defendant began exchanging messages with the victim through an application on his cell phone at around 12:21 A.M. on March 24, suggesting they meet and work out their differences at the direction of a higher-ranking Latin Kings member.  The victim agreed and instructed the defendant to come to his home.  The defendant and Natalie traveled to the victim's home in a taxicab and arrived at around 1:38 A.M.  As he and Natalie rode in the taxicab, the defendant called Nathan and explained that he was "on his way" to the victim's home "to go kill him."
            Upon arriving at the victim's home, the defendant and the victim smoked marijuana together for fifteen to twenty minutes.  After the victim informed the defendant of Jonathan's earlier threat, the defendant offered to "back [the victim] up" by confronting Jonathan with him.  The victim, who was using crutches due to an unrelated injury, bandaged his foot, obtained twenty dollars from his mother, retrieved a nine millimeter firearm from a shoebox, and left with the defendant and Natalie in a taxicab at around 2 A.M.
            The taxicab driver first transported the group to a home on Hancock Street in Springfield, which the victim entered for five to ten minutes before returning to the taxicab.  The group then directed the taxicab to the corner of Stafford Street and Nursery Street, where Natalie got out.  The defendant and the victim requested to be dropped off on Calhoun Street, across from Jefferson Park.  While en route, the victim began arguing with Jonathan again over the telephone and making threats.
            After the victim and the defendant got out of the taxicab, they walked into the aforementioned alley on Dwight Street, where the defendant shot the victim from behind with a .38 caliber revolver.  The defendant then took the victim's nine millimeter firearm and fled the scene.
            B.  Aftermath.  In the early morning hours of March 24 after the shooting, the defendant called his brother, Nelson Rios,[4] and asked to meet in a store parking lot a few minutes away from Nursery Street.  When the two met, the defendant told Nelson that he shot the victim from behind "on the side of a house" and showed Nelson both the .38 caliber revolver with which he shot the victim and a nine millimeter firearm he was carrying.  The defendant and Nelson then went to the apartment of Nelson's girlfriend, Maria Torres, on Nursery Street, in which Torres, Torres's children, and Natalie were present.  At some point, the defendant also called Nathan again and told him, "I killed [the victim]."
            At the Nursery Street apartment, the defendant called Jonathan, who, along with Self, was at Medina's apartment, and informed him that he shot and killed the victim.  Medina returned to her apartment thereafter, and the defendant called Jonathan again, demanding that the group remove the crutches and cell phone from the victim's body on Dwight Street.  When Jonathan and Self were unable to find the body on their first trip to the area, they returned to Medina's apartment, called the defendant, and received more detailed instructions regarding the body's location from the defendant.
            Either Jonathan and Self, or Jonathan, Self, and Medina,[5] left the apartment again, located the victim's body in the Dwight Street alley, and removed the victim's cell phone from his pocket.  Upon returning to Medina's apartment and contacting the defendant, the group was instructed by the defendant to make a third trip to collect the victim's crutches, which the defendant feared had blood or fingerprint evidence on them.  After taking the crutches from the victim's body, Jonathan, Self, and Medina ran over the victim's cell phone with Medina's car several times to destroy it and threw the crutches into the nearby Connecticut River.  With Jonathan and Self, Medina then drove to pick up Nathan, dropped Nathan and Jonathan off at different locations, and proceeded with Self to a fast food restaurant.
            While Medina and Self sat in Medina's car in the restaurant's parking lot, the defendant called them at around 6 or 7 A.M. and requested that the two go to the Nursery Street apartment.  When Medina and Self entered the apartment, Self observed the defendant "[p]acing back and forth" and saw both a nine millimeter firearm, which he had previously seen the victim carrying, and a .38 caliber revolver.  The defendant described to Self and Medina how he had killed the victim, including that he instructed the victim to go into the Dwight Street alley to prepare for Jonathan's purported arrival, shot the victim five times with the .38 caliber revolver, took the nine millimeter firearm from the victim's body, and ran to a gasoline station before meeting with Nelson.
            On March 25, the defendant sold the .38 caliber revolver to a former member of the Latin Kings for $400.  The revolver was later recovered by police in the buyer's attic, wrapped in a towel.  At some point prior to his arrest, the defendant also met with Michael again.  During their meeting, the defendant stated he "had a beef with the Kings" and that "[t]he Kings were looking for him . . . [b]ecause he killed [the victim]."  The defendant was carrying a nine millimeter firearm at the time and, after explaining that he was no longer part of the Latin Kings, declined to exchange the traditional Latin Kings salute with Michael.
            In the days following the murder, Jonathan, Medina, and Self grew fearful that the Latin Kings would hold them responsible for the victim's death and retaliate.  To exonerate themselves before the Latin Kings, the group decided that Medina would surreptitiously record the defendant confessing to the murder.  They would later provide this recording to a higher-ranking member of the Latin Kings as proof of their innocence.
            On March 29, while the defendant and Natalie were staying at Medina's apartment, Medina, Self, Natalie, and the defendant began to discuss the murder in Medina's bedroom.  As Medina lay on the bed and secretly recorded the conversation on her cell phone, the defendant stated, along with other details, that he killed the victim by shooting him five times.  From the window of Medina's bedroom, which faced the area in which the victim was killed, the defendant also "count[ed] the houses" to indicate the location of the shooting.  Medina testified that, rather than making one continuous recording of the defendant, she "turned [her cell phone] on and off" to avoid detection and, in doing so, made at least four separate recordings of the conversation -- although investigators later found only three recordings on the cell phone, as discussed infra.  Medina then provided her cell phone to Jonathan, who took it to a higher-ranking Latin Kings member to play Medina's recordings for him.
            C.  Initial investigation.  As described supra, the victim's body was discovered on the morning of March 25, 2015.  Investigators with the Springfield police department contacted the department's certified administrator for the city's ShotSpotter system,[6] seeking information about gunshot activations in the Dwight Street area that aligned with the victim's death.  The administrator determined that the only activation close in time and place occurred on March 24 at 2:32 A.M.  The automatically generated report from this activation identified five gunshots recorded between 2:32:52 A.M. and 2:32:54 A.M. approximately two hundred to three hundred yards from the location of the victim's body.
            Because the ShotSpotter data could be automatically overwritten seventy-two hours after the activation, the administrator contacted the company that operated the ShotSpotter system (SST) on March 27 requesting a "forensic report" on the March 25 activation.  Ronald Cayabyab, an SST employee, sent the report to the administrator on March 31.
            Contrary to the initial activation location, the forensic report mapped the location of the five gunshots to the Dwight Street address where the victim's body was found.  According to Cayabyab, the updated location resulted from Cayabyab's manual recalibration of the data to eliminate recorded echoes that may have been distorting the system's geolocation of the shots.[7]  At trial, Cayabyab testified that such distortion is "common" with ShotSpotter activations due to environmental factors and can be ameliorated by the type of "postprocessing" he conducted in this case.
            After receiving tips naming Medina as a possible participant in the victim's death, investigators brought Medina to a police station for an interview on March 31.  During the interview, Medina informed investigators that she had recordings of the defendant "saying that he murdered [the victim]" and permitted them to search and extract files from her cell phone.  A "download" of the cell phone's files, rather than a forensic extraction using the department's Cellebrite software, was performed.  This file transfer included three audio recordings, named "admitting," "trim_the point the whisper_002," and "voice_005."  Investigators returned the cell phone to Medina at the end of the interview.
            D.  Arrest and pretrial detention.  On April 2, police established surveillance of the Nursery Street apartment where the defendant, Natalie, Nelson, Torres, and Torres's children were staying.  Pursuant to arrest warrants for the defendant and Nelson and a search warrant for the apartment, police entered and arrested both men.  A search of the apartment revealed a nine millimeter firearm under a bedroom bureau, a loaded Hi-Point semiautomatic firearm in a closet, and .38 caliber and nine millimeter ammunition.
            The defendant was detained at the Franklin County house of correction (FCHC) while awaiting trial.  On July 1, 2016, the defendant asked another detainee to pass a handwritten letter to Nelson, who was also detained at FCHC.  The detainee instead turned the letter over to FCHC personnel.
            In his letter to Nelson, the defendant described the aforementioned events leading up to the murder in detail.  He also stated that, on the morning of the murder, he and the victim traveled together to Jefferson Park, near Calhoun Street, by taxicab and walked to Dwight Street.  The defendant asserted that he and the victim walked in different directions thereafter, such that the defendant "heard five shots" as he headed away from the area.  According to the defendant, while on the telephone with Jonathan a few minutes later, Jonathan stated, "Yeah, I am good[;] we got him."  When the defendant asked Jonathan to whom he was referring, Jonathan replied, "Kenneth.  He's dead."
            As part of an internal contraband investigation in the summer of 2016, detailed infra, FCHC's assistant superintendent of security, Jon Goodell, sought and received permission from FCHC's superintendent to intercept and read the defendant's outgoing mail.  Pursuant to this process, Goodell seized a letter from the defendant to his sister, Tiffany Matos, in which the defendant made several incriminating statements, including referring to Nelson as a "snitch" who enabled investigators to find the murder weapon; his intention to go to trial quickly because the Commonwealth did not have "hard evidence" against him; his desire to "make [Medina] disapier [sic]"; and, after blaming Nelson and Medina for his arrest, concluding, "[T]hat's why I did it by myself" -- in the context of the full letter, apparently referring to the murder of the victim.  Goodell provided the letter to Springfield police.
            In September 2017, the defendant, who had been moved to the Northampton house of correction, approached another detainee, David Ruiz, with whom he was acquainted through the Latin Kings.  The defendant wrote a narrative of the murder describing Nathan as the shooter and offered Ruiz $2,500 to relay this version of events to investigators.  According to Ruiz, who testified at the defendant's trial pursuant to a cooperation agreement, the written narrative "basically took [the defendant] out and put Nathan's name there."  The defendant "was going to have an investigator talk to [Ruiz] and [Ruiz] was supposed to say this lie."  Ruiz gave the letter from the defendant, as well as a second "refresher" letter from the defendant covering the same version of events, to authorities. 
            b.  Procedural history.  i.  Indictment.  On June 5, 2015, a grand jury in Hampden County returned twelve indictments against the defendant, charging him with the murder of Kenneth Lopez, in violation of G. L. c. 265, § 1; conspiracy to commit murder, in violation of G. L. c. 274, § 7; two counts of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a); two counts of unlawful possession of a firearm without a firearm identification (FID) card, in violation of G. L. c. 269, § 10 (h); unlawful possession of ammunition without an FID card, in violation of G. L. c. 269, § 10 (h); unlawful possession of a large capacity feeding device, in violation of G. L. c. 269, § 10 (m); unlawful sale of a firearm, in violation of G. L. c. 140, § 128; improper storage of a large capacity firearm near a minor, in violation of G. L. c. 140, § 131L (a) and (d); unlawful possession of a class B controlled substance with intent to distribute, in violation of G. L. c. 94C, § 32A (c); and violation of the controlled substance law within three hundred feet of a school, in violation of G. L. c. 94C, § 32J.  The controlled substance charges were nol prossed prior to trial.
            ii.  Pretrial motions.  In the roughly two and one-half year period between his indictment and his trial, the defendant filed numerous pretrial motions.  We briefly summarize the motions relevant to our discussion.
            A.  ShotSpotter motions.  In June 2016, the defendant filed a discovery motion for, among other things, records of ShotSpotter activations in Springfield between 1:30 A.M. on March 24, 2015, and the discovery of the victim's body on March 25, 2015; all related data and records; and all related communications between SST and the Springfield police department, particularly communications "involving the recalibration of the location."  The Commonwealth agreed to this discovery, and the motion was allowed.
            In September 2017, the defendant sought to compel discovery regarding the ShotSpotter activation and SST's location calculation and calibration processes.  The Commonwealth opposed the motion.  Later that month, after a hearing, a motion judge allowed the defendant's motion in part, denied the motion in part, and ordered the Commonwealth to provide the defendant with ShotSpotter's relevant microphone locations, 2015 maintenance history, and service contracts in effect at the time of the murder.
            After the Commonwealth disclosed its intention to call Cayabyab, the SST employee who produced ShotSpotter's forensic report for this case, as an expert witness at trial, the defendant filed a motion to preclude this expert testimony in November 2017.  At a hearing before the trial judge in January 2018, the defendant asserted that SST had refused to share, or allow Cayabyab to share, the underlying "mechanics," "calculations," "algorithms," and "data" of the manual recalibration process.  Accordingly, the defendant argued that the basis of the expert opinions and conclusions Cayabyab would offer at trial had not been adequately disclosed.  The trial judge reserved judgment and denied the defendant's motion one week later after Cayabyab was subject to voir dire.
            B.  Motion to suppress Medina's recordings and the defendant's intercepted mail.  In July 2017, the defendant filed a motion to suppress Medina's recordings on two bases:  (1) because investigators failed to preserve the full contents of Medina's cell phone via a forensic extraction, exculpatory information relevant to the recordings was lost; and (2) Medina's interception and unauthorized recording of the defendant was unlawful.  On the same day, the defendant also filed a motion to suppress outgoing mail seized from him while in pretrial detention.
            The motion regarding the recordings was denied in August 2017 insofar as it sought suppression because of lost exculpatory evidence, with the defendant granted an opportunity to address his second ground for suppression at a later hearing.  The motion for suppression of the defendant's mail was denied in December 2017.
            Before the same motion judge at a hearing on January 10, 2018, the defendant argued that Medina's recordings should be suppressed because they were obtained in violation of Massachusetts's wiretap statute, G. L. c. 272, § 99.  The motion was denied by the motion judge on January 17.  Also on January 17, the trial judge heard argument on various motions in limine from both parties, including a separate motion from the defendant seeking to preclude admission of Medina's recordings because they could not be sufficiently authenticated.  The trial judge reserved judgment until January 26, at which point he denied the motion after conducting voir dire examinations of Medina, the defendant's audio expert, and the Springfield police officer who downloaded the audio files from Medina's cell phone.
            iii.  Trial and posttrial motion for a new trial.  A jury trial commenced on January 18, 2018.  Medina, Nelson, Nathan, and Self -- all of whom were charged in some capacity for their involvement in the victim's murder -- testified against the defendant pursuant to cooperation agreements with the Commonwealth.  On February 2, the jury found the defendant guilty of murder in the first degree under the theories of premeditation and extreme atrocity or cruelty.  The jury also returned guilty verdicts for the eight firearms charges.
            The trial judge sentenced the defendant to life in prison without parole for the murder conviction, with concurrent terms of imprisonment on seven of the firearms convictions.  For his conviction of improper storage of a large capacity firearm near a minor, the defendant was sentenced to a term of from fourteen to fifteen years' imprisonment, to be served consecutively to his life sentence.  The defendant timely filed a notice of appeal.
            In August 2022, the defendant filed a motion for a new trial, which we remitted to the trial court.  An amended motion for a new trial followed in April 2023.  After a nonevidentiary hearing, the trial judge denied the motion on July 20, 2023.  The defendant's appeal from the denial of this motion was consolidated with his direct appeal from his convictions.
            2.  Discussion.  a.  Denial of defendant's motion for a new trial.  In his motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), the defendant asserted three grounds:  (1) testimony by an SST employee in an unrelated California case involving SST's postprocessing practices constituted newly discovered evidence; (2) Jonathan's guilty plea in connection to his involvement in the murder constituted newly discovered evidence; and (3) the defendant was deprived of his right to present a complete defense due to the Springfield police department's mishandling of data extracted from Medina's cell phone. 
            Where, as here, an appeal from the denial of a motion for a new trial has been consolidated with a defendant's direct appeal from a conviction of murder in the first degree, "we review the denial of the motion for a new trial under G. L. c. 278, § 33E."  Commonwealth v. Duke, 489 Mass. 649, 662 (2022).  Our review is therefore centered on "whether there has been a significant error of law or other abuse of discretion . . . and whether any such error creates a substantial likelihood of a miscarriage of justice."  Commonwealth v. Vargas, 475 Mass. 338, 355 (2016), quoting Commonwealth v. Lally, 473 Mass. 693, 698 (2016).
            The trial judge in this case also ruled on the defendant's motion for a new trial.  In such circumstances, 
"the judge's finding that the defendant's motion and affidavit did not raise a substantial issue is entitled to substantial deference, . . . and the judge could properly use his knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing."
Commonwealth v. Amaral, 482 Mass. 496, 509 (2019), quoting Commonwealth v. Wallis, 440 Mass. 589, 596 (2003).  "The decision to deny a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or the trial was infected with prejudicial constitutional error."  Commonwealth v. Imbert, 479 Mass. 575, 581 (2018), quoting Commonwealth v. Jenkins, 458 Mass. 791, 803 (2011).
            For the reasons stated infra, we find no significant error of law or abuse of discretion in the denial of the defendant's motion for a new trial.  Accordingly, we affirm.
            i.  ShotSpotter.  In his motion for a new trial, the defendant unsuccessfully raised two arguments regarding the admission of ShotSpotter evidence:  (1) the defendant received ineffective assistance of counsel insofar as trial counsel did not hire an audio engineer to rebut the reliability, and therefore the admissibility, of the ShotSpotter evidence; (2) testimony from an SST employee, Paul Greene, in a July 2017 criminal case in California constituted newly discovered evidence as to the reliability of SST's postprocessing methods.  We address each in turn, beginning with the ineffective assistance of counsel claim.
            A.  Ineffective assistance of counsel.  In support of his assertion that trial counsel rendered ineffective assistance by failing to retain an audio expert to rebut Cayabyab's testimony as to the reliability of SST's postprocessing, the defendant obtained and submitted an affidavit and report from Robert Maher.  At core, Maher, who holds a Ph.D. in electrical engineering and is a professor of electrical and computer engineering, attested that the ShotSpotter forensic report was insufficient "to assess the accuracy of ShotSpotter's calculations."  The defendant argues that, had his counsel retained Maher or a similarly qualified individual as an expert witness, he could have effectively challenged the admission of the postprocessing results due to their lack of reliability.
            When evaluating an ineffective assistance of counsel claim in connection with the direct appeal from a conviction of murder in the first degree, "we review for a substantial likelihood of a miscarriage of justice by asking whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion."  Commonwealth v. Kirkland, 491 Mass. 339, 346 (2023), quoting Commonwealth v. Don, 483 Mass. 697, 704 (2019).  We apply this standard "even if the action by trial counsel does not constitute conduct falling measurably below that of an ordinary fallible lawyer" (quotation and alteration omitted).  Kirkland, supra, quoting Don, supra.  Our review "accord[s] tactical decisions of trial counsel due deference."  Kirkland, supra, quoting Don, supra at 704-705.
            As to ineffective assistance claims involving expert testimony, "[t]he absence of expert testimony constitutes ineffective assistance where such testimony could provide a substantial ground of defense or is necessary to rebut critical expert testimony relied upon by the Commonwealth."  Commonwealth v. Jacobs, 488 Mass. 597, 606 (2021).  Whether to call or not call an expert witness "fits squarely within the realm of strategic or tactical decisions."  Commonwealth v. Ayala, 481 Mass. 46, 63 (2018).  We therefore evaluate whether such a decision was "manifestly unreasonable" (citation omitted).  Id.  See Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).
            On the record before us, we cannot conclude that trial counsel's decision to not call an expert to rebut Cayabyab's testimony was manifestly unreasonable.  As the trial judge determined in his denial of the motion for a new trial, where trial counsel's motion in limine largely focused on SST's refusal to provide sufficient information to enable the defendant to review and test its calculations, an expert opinion effectively confirming that the defendant did not receive sufficient information would have been largely cumulative.  In this sense, expert testimony would not have meaningfully rebutted Cayabyab's testimony or, by extension, "influenced the jury's conclusion" as to the defendant's guilt.  See Kirkland, 491 Mass. at 346; Jacobs, 488 Mass. at 606.
            Importantly, trial counsel also vigorously challenged the accuracy and reliability of SST's methods via her cross-examination of Cayabyab.  Trial counsel elicited testimony regarding, inter alia, the lack of testing on the quantifiable impact of built structures on ShotSpotter's accuracy; public challenges to ShotSpotter's accuracy, including a published third-party study; and indications that Cayabyab may have had undocumented discussions with Springfield police personnel regarding the case before finalizing the ostensibly objective geolocation.  Cayabyab further testified that SST's guarantee that ShotSpotter captures eighty percent of all detectable events within twenty-five meters of an actual shooting was merely a "ShotSpotter policy" statement.  Crucially, Cayabyab also agreed with trial counsel that his forensic report made no mention of the impulsive sounds or echoes that were apparently essential to his postprocessing, concurring with trial counsel's characterization that Cayabyab "eventually just said that [he] manually selected some of the data and reprocessed it through a process that [he] won't disclose."
            In light of such able cross-examination, we cannot say that trial counsel's strategic decision to forgo expert testimony in this domain was a decision that "lawyers of ordinary training and skill in criminal law would not consider competent" (citation omitted).  Ayala, 481 Mass. at 65.  See Commonwealth v. Watson, 455 Mass. 246, 257-258 (2009) (trial counsel's decision to not seek funds for an eyewitness identification expert where reliability of identification challenged on cross-examination and in closing argument not "manifestly unreasonable").  Accordingly, trial counsel's decision was not manifestly unreasonable, and the assistance rendered by counsel was not ineffective.
            B.  Newly discovered evidence.  The defendant also sought a new trial based on newly discovered evidence regarding ShotSpotter's lack of reliability, particularly with respect to the manual postprocessing in which Cayabyab engaged.  Such evidence was in the form of testimony by Paul Greene, SST's forensic service manager, in a California criminal case in July 2017 -- six months before the defendant's trial.  The trial judge found that the testimony was not "new" for the purposes of a new trial motion and, in any event, did not cast real doubt on the justice of the defendant's convictions.
            To succeed on a motion for a new trial on the basis of newly discovered evidence, the defendant must satisfy both prongs of a two-part test:  (1) the defendant "must establish that the evidence was unknown to the defendant or trial counsel and not reasonably discoverable at the time of trial"; and (2) the defendant "must show that the evidence 'casts real doubt on the justice of the conviction.'"  Commonwealth v. Cowels, 470 Mass. 607, 616 (2015), quoting Commonwealth v. Shuman, 445 Mass. 268, 271 (2005), and Commonwealth v. Grace, 397 Mass. 303, 305 (1986).  Stated differently, the defendant must "establish that evidence is, in fact, newly discovered, and must show that the new evidence is 'material and credible' and that 'there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial.'"  Commonwealth v. Moore, 489 Mass. 735, 749 (2022), quoting Commonwealth v. Santiago, 458 Mass. 405, 415 (2010).  Furthermore, newly discovered evidence that is "cumulative of evidence admitted at the trial tends to carry less weight" in this regard than "new evidence that is different in kind."  Cowels, supra at 617, quoting Grace, supra at 305-306.
            We review the denial of a motion for a new trial based on newly discovered evidence for abuse of discretion or other error of law.  Moore, 489 Mass. at 749, citing Commonwealth v. Gibson, 489 Mass. 37, 51 (2022).  Where, as in this case, the motion judge was also the trial judge, we accord deference to the motion judge's views.  See Moore, supra, citing Commonwealth v. LeFave, 430 Mass. 169, 176 (1999).  We discern no such abuse of discretion or error of law.
            We are not aware of, and the defendant does not cite, case law supporting his position that Greene's testimony, which arose in an out-of-State case adjudicated six months before the defendant's trial, was "not reasonably discoverable" (citation omitted).  See Cowels, 470 Mass. at 616.  The defendant has also not demonstrated that this testimony "casts real doubt on the justice of the conviction" (citation omitted).  See id.
            In the California case, Greene testified, inter alia, that SST analysts' adjustments are "manually performed" and therefore subjective.  Greene also confirmed that neither SST's postprocessing capabilities, which he described as "simply a byproduct" of ShotSpotter's actual intended use, nor its aforementioned gunshot detection guarantee have been externally validated.  Such information is largely cumulative, in that it closely mirrors that to which Cayabyab testified on cross-examination at the defendant's trial, as described supra.[8]
            There was also sufficient evidence, independent of ShotSpotter, that the victim was shot at the time of the ShotSpotter alert and at the Dwight Street location where his body was later found, as Cayabyab ultimately reported.  As noted supra, an officer who responded to the scene testified that the victim's body "appeared to be almost frozen because it appeared to be there a long time" when it was discovered on March 25, 2015.  The taxicab driver hired by the defendant and the victim recalled that he dropped the pair off on Calhoun Street, which intersects with Dwight Street, after 2 A.M. on March 24, and the defendant's confiscated letter to Nelson while in pretrial detention placed the victim and the defendant together on Dwight Street just before the shooting.  Critically, police found a "lead projectile" on scene "a few feet away from Mr. Lopez's body."  This projectile, like the projectiles recovered from the victim's body, was consistent with .38 caliber ammunition.  The defendant claimed to have shot the victim using a .38 caliber revolver.
            Finally, there was overwhelming evidence of the defendant's guilt entirely separate from the ShotSpotter evidence.  The defendant, for example, made several highly incriminating statements on recorded audio, in intercepted letters, and to multiple people across multiple settings.  In selling the murder weapon and directing his associates to remove evidence from the victim's body, the defendant took deliberate steps to conceal his actions.  His attempts while in pretrial detention to propagate narratives blaming either Jonathan or Nathan for the murder speak to the defendant's consciousness of guilt.  There was also no shortage of evidence going to the defendant's motive, manner of killing, and premeditation.
            In sum, the overwhelming evidence of the defendant's guilt, detailed supra, ameliorated any risk that Greene's testimony regarding the ShotSpotter technology would have been a "real factor in the jury's deliberations" (citation omitted).  See Moore, 489 Mass. at 749.  Accordingly, we conclude that there is not a substantial risk that the jury in the defendant's trial would have reached a different conclusion if Greene's testimony had been admitted.  A new trial was not warranted on this basis.
            ii.  Jonathan's plea deal.  Jonathan was indicted for the victim's murder, in violation of G. L. c. 265, § 1, and indicted alongside the defendant, Medina, and Self for conspiracy to commit murder, in violation of G. L. c. 274, § 7.  On December 20, 2018, Jonathan pleaded guilty to one count of conspiracy to commit armed robbery, in violation of G. L. c. 274, § 7; and one count of accessory to murder after the fact, in violation of G. L. c. 274, § 4.  He was sentenced to from ten to thirteen years' imprisonment on the conspiracy conviction and a concurrent term of from five to seven years' imprisonment on the accessory conviction.  Jonathan did not testify at the defendant's trial.
            The defendant contends that the facts set forth in Jonathan's plea colloquy describe the failed plan to ambush the victim on March 23, 2015, as an intended robbery, rather than as an intended murder.  In the defendant's view, the facts affirmed by Jonathan in his plea contradict evidence offered at the defendant's trial to demonstrate the defendant's lethal intent for the March 23 plan and, by extension, premeditation of the victim's murder.  Consequently, the defendant attempts to cast Jonathan's plea colloquy and the narrative of events therein as newly discovered evidence warranting a new trial.
            As discussed supra, to succeed on a motion for a new trial on the basis of newly discovered evidence, the defendant must demonstrate both that (1) the "evidence was unknown to the defendant or trial counsel and not reasonably discoverable at the time of trial"; and (2) "the evidence 'casts real doubt on the justice of the conviction.'"  Cowels, 470 Mass. at 616, quoting Shuman, 445 Mass. at 271, and Grace, 397 Mass. at 305.
            In his denial of the defendant's motion for a new trial, the trial judge determined that Jonathan's plea both constituted inadmissible hearsay and, even if admissible, "was not inconsistent with the defendant's guilt."  Commonwealth v. Fernandes, 30 Mass. App. Ct. 335, 339 (1991).  We agree that the plea colloquy did not necessitate a new trial.  We need not grapple with the hearsay question, as the purported evidence from the colloquy neither is newly discovered nor does it "cast real doubt" on the justice of the convictions.  See Cowels, 470 Mass. at 616.
            Jonathan's participation in the events in question, as amply testified to in the trial record, is not newly discovered evidence.  The facts to which Jonathan agreed in his plea are also not inconsistent with the Commonwealth's theory of the case or the witness testimony elicited at the defendant's trial.  The defendant's overarching plan was to isolate and kill the victim.  That Jonathan pleaded guilty only to conspiracy to commit robbery and accessory to murder after the fact did little or nothing to contradict the original version of this overarching plan, in which the defendant unsuccessfully sought to rob and kill the victim with a shotgun during a decoy drug deal.  If anything, Jonathan's plea reflects the necessary compromises, for both the Commonwealth and defendant, associated with plea bargaining.  See Easterbook, Plea Bargaining as Compromise, 101 Yale L.J. 1969, 1978 (1992) ("Plea bargains are compromises").
            At trial, the jury also heard testimony from Nathan and Self that sometimes referred to the March 23 plan as a plan to rob the victim and sometimes referred to it as a plan to murder the victim.  The jury were therefore already tasked with deciding the true nature of that plan, regardless of Jonathan's account.  Accordingly, nothing in Jonathan's plea "casts real doubt on the justice of the conviction" (citation omitted).  Cowels, 470 Mass. at 616.
            iii.  Handling of Medina's cell phone.  A.  Cell phone evidence.  At trial, the defense relied heavily on its argument that, based on available metadata, two of the three audio recordings in which the defendant implicated himself were created several days before the murder and later manipulated by Medina to shift blame to the defendant.  The defendant primarily advanced this theory through the testimony of his audio expert, Lindsay Hawk, who opined that these recordings were "altered or edited."  Hawk based her conclusion on a combination of factors, including Medina's description of the recordings as "videos" during her first interview with police, a term that sometimes "refers to editing" contained in one of the file names, and various discrepancies in the files' metadata pertaining to file signatures, file length, and date and time stamps.
            As detailed supra, to obtain Medina's audio recordings of the defendant, investigators manually transferred files from Medina's cell phone to a police department computer.  They did so because the department's forensic extraction software, Cellebrite, did not support Medina's particular cell phone model.  The data captured by the file transfer process was not equivalent to the data that would have been captured via a forensic extraction, especially with respect to the file transfer process's inability to capture all relevant metadata.
            For reasons not made fully clear in the record, investigators, due to an apparent miscommunication with the officer who performed the March 2015 file transfer, initially informed defendant's counsel that a forensic Cellebrite extraction of Medina's cell phone was completed.  It was not until August 2017 that investigators notified defendant's counsel that a forensic Cellebrite extraction had not, in fact, been completed and the files made available to the defendant were obtained via a basic file transfer.  The cell phone itself had been returned to Medina at the conclusion of her first interview with police in March 2015.
            In his motion for a new trial, the defendant asserted that the Commonwealth's "negligent" handling of Medina's cell phone and failure to perform a forensic extraction of its contents amounted to a violation of his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  To support his argument, the defendant submitted an affidavit from Steven Verroneau, an expert in mobile forensics.  Verroneau opined, in relevant part, that Cellebrite had the capability to conduct at least some form of forensic extraction on Medina's cell phone model in March 2015 and concluded that "[t]he Springfield Police handled the device with complete disregard for the integrity of the cellular evidence."
            The trial judge analyzed the defendant's claim under Commonwealth v. Neal, 392 Mass. 1, 12 (1984), which requires that a defendant show a "reasonable possibility, based on concrete evidence, rather than a fertile imagination, that access to the [source of evidence] would have produced evidence favorable to his cause," and concluded that the defendant failed to make such a showing (quotation and citation omitted).  We discern no error.
            In Commonwealth v. Williams, 455 Mass. 706, 718 (2010), we explained the Neal approach to assessing a claim of lost or destroyed potentially exculpatory evidence as follows:  
"When a defendant makes a claim that the government has lost or destroyed potentially exculpatory evidence, it makes sense that he or she should bear the initial burden of demonstrating the exculpatory nature of that evidence, using the Neal "reasonable possibility, based on concrete evidence" formulation.  We therefore hold that the defendant will be required to meet this threshold burden in order to advance a claim for relief.  If the defendant does meet the burden . . . the judge, or the court on appeal, must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief."  (Citation omitted.)
If the defendant does not make the requisite threshold showing under Neal, there is no need for the court to engage in a balancing test.  Id.  A defendant may nonetheless be entitled to a remedy where the Commonwealth's bad faith or recklessness has resulted in the loss or destruction of the evidence.  Id.
            Here, we discern no error in the trial judge's conclusion that the defendant did not satisfy Neal's threshold requirement.  The defendant has not demonstrated a reasonable possibility, based on "concrete evidence," that a forensic extraction of Medina's cell phone would have produced exculpatory evidence.  His suggestion to this effect is at best conclusory, as there is no "concrete evidence" supporting the defendant's assertion that Medina or another party manipulated the pertinent audio files in such a way that the defendant's inculpatory statements were somehow derived from exculpatory statements.  Discrepancies in the audio files' date and time stamps, which provide the most cogent support for this argument, were addressed in State police Trooper Michael Blanchette's testimony as an expert for the Commonwealth, discussed infra.  The defense's audio expert, although she maintained her belief that the audio files were altered in some way, did not rule out the logic of Blanchette's explanation for these discrepancies.[9]  On the record before us, then, we cannot conclude that the defendant's assertion is anything more than the product of "a fertile imagination."  Neal, 392 Mass. at 12. 
            B.  Trooper Blanchette's testimony.  In a similar vein, the defendant also challenges the Commonwealth's very elicitation of Trooper Blanchette's testimony as to the discrepancies in the date and time stamps of the audio files taken from Medina's cell phone.  Blanchette opined that, based on his on-the-stand review of a screenshot from Medina's cell phone that displayed two different dates at the same time, "[t]here [was] some sort of system malfunction with the phone."  Blanchette's pretrial report regarding his examination of the cell phone did not contain or allude to this conclusion, with the Commonwealth explaining at trial that the screenshot on which Blanchette opined was only discovered after the trial commenced.  The defense was timely provided a copy.
            In his motion for a new trial, the defendant claimed that the court erred by allowing Blanchette to testify that a "system malfunction" in Medina's cell phone could account for discrepancies in the date stamps of two of the contested audio recordings.  Treating this assertion as a discovery violation claim, the trial judge first questioned whether a violation had even occurred in light of voir dire testimony from the defendant's audio expert that was "effectively the same as Trooper Blanchette's inference."  Furthermore, to the extent a violation did occur, the trial judge found that it "did not influence the jury, or had but very slight effect," in light of the "overwhelming" evidence of the defendant's guilt.  We discern no reason to disturb the trial judge's decision on this claim.
            b.  Pretrial motion to suppress the defendant's outgoing mail.  The defendant challenges the admission in evidence of a letter he sent to his sister, Tiffany Matos, while he was detained pretrial at FCHC.  The letter, dated July 2, 2016, contained incriminating statements, including:
"[O]ur bitch ass brother pito[10] snitch on me can you beaulive [sic] . . . .  [I] am done cuss [sic] of Him snitching, they got the murder weapon cuss [sic] He snitch on the n---- that Had it . . . .  [A]nyways they need Hard evidence wish [sic] they don't have so I am trying to go to trial as soon as possible[.]  I would like to make that bitch disapier [sic] but I don't trust no body u know[.]  [I]f you wanna see who she is Her name is Valery [sic] Medina . . . .  [T]hat's why I did it by myself . . . ."
In the letter, the defendant also requested that Matos purchase a spray bottle of synthetic marijuana for approximately fifty dollars, spray the substance onto plain sheets of paper, write letters to him on the saturated sheets once dry, and mail them to FCHC.  On appeal, the defendant argues that the seizure of his letter to Matos violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.
            As referenced supra, the defendant's letter was intercepted during an internal contraband investigation at FCHC.  Specifically, after listening to several calls made by the defendant on the facility's recorded telephone lines, FCHC personnel suspected the defendant of devising a plan to smuggle synthetic marijuana into FCHC for distribution to other inmates.
            In recorded calls to a person known only as "Peter" on June 29 and July 6, 2016, the defendant discussed the potential profit from selling a sheet of synthetic marijuana to other FCHC inmates, suggested a process by which Peter could be reimbursed by the defendant for supplying the drug, and gave Peter the telephone number for "Tiffany," along with instructions to call her.  During at least one of these calls, the defendant was specifically interested in having Peter "mail in" sheets of plain paper on which synthetic marijuana had been sprayed.
            After being alerted to these calls by a correctional officer, Jon Goodell, FCHC's assistant deputy superintendent of security, sought to intercept the defendant's incoming and outgoing mail.  Goodell testified that his intent was to determine
"if [the defendant] had any plans specific of who [the synthetic marijuana] was going to, how the money was going to be transferred, who it would be sent in to, and just how the whole process was going to work[,] just so [FCHC] can keep that contraband from coming into the facility."
Pursuant to an internal FCHC policy, general order no. 481, Goodell applied for and received authorization from FCHC's superintendent before carrying out this plan. 
            General order no. 481 provides that FCHC's superintendent "may authorize the reading of incoming or outgoing mail when, in his opinion, such action is necessary to intercept prohibited materials and/or information which would be a threat to public safety or the security of the institution."  This policy is not included in FCHC's inmate handbook, but it is available to all inmates on the FCHC library's computers.  The FCHC inmate handbook does clearly state, in bold, capitalized letters, "All calls made on the blue [inmate and detainee] telephones except attorney and consulate calls are recorded and subject to monitoring."  Signs posted by the telephones also inform inmates that their calls are monitored.
            i.  Standard of review.  In his pretrial motion, the defendant sought to suppress the letter chiefly on the basis that its seizure violated his rights under the First Amendment to the United States Constitution, with only a passing reference to the Fourteenth Amendment and arts. 14 and 16 of the Massachusetts Declaration of Rights.  At a pretrial hearing on this motion, the defendant also intimated, for the first time, that the seizure of the letter was itself unreasonable and based on unfounded suspicion.  That said, defense counsel continued to base her suppression argument primarily in the First Amendment, stating, "I would also suggest to Your Honor that my client's right to mail is governed more by the First Amendment than by the Fourth."  At trial, the defendant objected "relative to [his] motion to suppress" when the Commonwealth sought to introduce the letter as an exhibit.  We affirm the denial of the motion to suppress.[11]
            ii.  Analysis.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the judge's] ultimate findings and conclusions of law" (quotation omitted).  Commonwealth v. Medina, 485 Mass. 296, 299-300 (2020), quoting Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018).  The defendant contends that his motion to suppress statements he made in the letter he wrote to Matos should have been allowed.
            "[A] pretrial detainee enjoys at least as many constitutional rights as a convicted prisoner and perhaps more."  Commonwealth v. Silva, 471 Mass. 610, 617 (2015).  A detainee's constitutional right to be free from unreasonable searches and seizures, however, may be limited by policies "reasonably related to [a correctional institution's] legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").  See Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 770 (1996).  Cf. Kenney v. Commissioner of Correction, 393 Mass. 28, 34-35 (1984) (correctional institution's "broad discretion" in administration of prison affairs regarding institutional security not unlimited in light of inmate's constitutional due process rights).
            To establish a violation of an incarcerated defendant's rights under the Fourth Amendment and art. 14, the defendant bears the burden of proving he or she had a reasonable expectation of privacy in the item seized.  Commonwealth v. Miller, 475 Mass. 212, 219 (2016).  "To do so, the defendant must demonstrate both that he had a subjective expectation of privacy in the item and that the 'expectation of privacy [is] one that society is prepared to recognize as 'reasonable.'"  Id. at 219-220, quoting Matter of a Grand Jury Subpoena, 454 Mass. 685, 688 (2009).  The second prong of this standard seeks to determine whether the defendant's expectation of privacy is "objectively reasonable."  Matter of a Grand Jury Subpoena, supra at 693.
            Here, regardless of whether the defendant possessed a subjective expectation of privacy in his outgoing letter to his sister, any such expectation was not objectively reasonable.  We therefore discern no error in the denial of the defendant's motion to suppress the defendant's letter.
            The defendant argues he was not on notice that his outgoing mail could be seized and inspected, as FCHC's policy on the seizure of outgoing mail is not specifically addressed or referenced in FCHC's inmate handbook.  "Whether an inmate has a subjective expectation of privacy generally turns on whether the inmate has notice of the policy of the penal institution allowing for the search or seizure of a particular item."  Miller, 475 Mass. at 220.  See Matter of a Grand Jury Subpoena, 454 Mass. at 689; Cacicio, 422 Mass. at 772-773.
            Although we have not fulsomely dealt with the issue of the seizure of a pretrial detainee's nonprivileged outgoing mail, we have addressed analogous situations involving an inmate's subjective expectation of privacy when using jail telephone lines.  See Matter of a Grand Jury Subpoena, 454 Mass. at 688-689; Cacicio, 422 Mass. at 772-773.  In Matter of a Grand Jury Subpoena, supra at 686-687, 689, for example, we held that detainees did not have a subjective expectation of privacy where they were advised of call monitoring by a prerecorded announcement each time a call was made, informed of call monitoring and recording during the institution's orientation, provided with a written guide stating that the sheriff recorded all nonprivileged inmate calls, and could observe signs posted on or near all telephones stating the monitoring and recording policy.  See Cacicio, supra at 772 (no expectation of privacy where inmates were made aware of call policy, such that "monitoring and recording is not surreptitious in any sense").
            In support of his motion to suppress the letter, the defendant submitted a copy of the FCHC inmate handbook, which does not state or reference the outgoing mail policy contained in general order no. 481.  The handbook does include general order no. 400, which requires that inmates receive "a copy of the Inmate Handbook which contains the rules of the facility" (emphasis added), and general order no. 478, which describes FCHC's library services in detail but does not indicate that additional facility rules may be found there.  In his affidavit, however, the defendant made no assertion, explicit or otherwise, that the defendant believed his outgoing mail would not or could not be seized, or that he believed the FCHC inmate handbook contained the complete universe of jail policies.  See Miller, 475 Mass. at 220 ("apparent" that inmate's motion to suppress outgoing letter would have failed where inmate did not argue he believed mail would not be monitored or lacked notice of prison regulation authorizing mail monitoring).
            Whether the defendant had notice of FCHC's specific outgoing mail policy, however, is somewhat peripheral to our analysis given the facts of this case.  This is not a situation where the defendant's mail was read indiscriminately or at random.  Despite having sufficient notice that FCHC telephone lines were monitored and recorded, the defendant openly discussed plans to smuggle synthetic marijuana into FCHC in his calls to "Peter" and his intention to use the mail system to do so.  See Matter of a Grand Jury Subpoena, 454 Mass. at 689 (no expectation of privacy when making calls on correctional facility telephones); Cacicio, 422 Mass. at 772-773 (same).  It was only after FCHC personnel gathered information from these overtly monitored calls that the defendant's nonprivileged outgoing mail was seized and read in a manner consistent with the requirements of general order no. 481. 
            FCHC's inmate handbook, on which the defendant relies as the basis for his motion, plainly lists "introduction, distribution, or use of any unauthorized controlled substance," "[v]iolating any law of the Commonwealth of Massachusetts or the United States of America," or "[a]ttempting to commit . . . , making plans to commit . . . , or aiding another person in committing" these offenses as violations of FCHC's rules.  The handbook also lists as contraband "[a]ny items declared illegal by state or federal law," which would necessarily include a controlled substance such as synthetic marijuana.  Notably, the defendant's plan also explicitly involved the use of FCHC's mail system to bring paper saturated with the narcotic into the facility.  Taken together, then, the defendant's awareness of FCHC's telephone and contraband policies, along with his stated intention to use the mail to carry out his plan to smuggle in contraband, sufficiently placed the defendant on notice both that he was engaged in prohibited activity and that monitoring of such activity to prevent and punish it would be expected.
            Regardless of whether the defendant possessed a subjective expectation of privacy in his outgoing letter, however, any such expectation was not objectively reasonable.  FCHC's policy permitting the seizure of outgoing mail under limited circumstances is justified by legitimate penological interests - namely, "the central objective of prison administration, safeguarding institutional security."  Bell v. Wolfish, 441 U.S. 520, 547 (1979).  See Commonwealth v. Rosa, 468 Mass. 231, 243 (2014) (court has generally validated regulations serving "the legitimate penological purpose of advancing the security of prisons"); Commissioner of Correction v. Myers, 379 Mass. 255, 264 (1979) ("preservation of internal order and discipline" and "maintenance of institutional security" are recognized governmental interests in carceral settings).  Cf. Matter of a Grand Jury Subpoena, 454 Mass. at 691 ("detection and deterrence of criminal activity" occurring inside institution or facilitated through institution's telephone system is valid penological interest).
            The synthetic marijuana central to the defendant's plan was known by FCHC personnel to create "an intense and sometimes deadly high" for those who ingest it.  The flow of such contraband into FCHC posed an obvious risk to the safety and security of the institution and the health of the inmates and detainees held there.  The fact that the synthetic marijuana was to be distributed on paper made the mail a particular concern.  The interception of the defendant's outgoing letter for the purpose of thwarting his synthetic marijuana smuggling plan was thus squarely within the bounds of FCHC's interest in maintaining institutional security, including its interest in stopping the flow of illegal and potentially dangerous contraband into the facility.  See Rosa, 468 Mass. at 243; Matter of a Grand Jury Subpoena, 454 Mass. at 690-692; Cacicio, 422 Mass. at 769-770.  
            The defendant's argument that FCHC personnel did not possess evidence that the defendant's plan specifically involved Matos is without merit.  As a practical matter, FCHC personnel could reasonably infer that, given that the defendant expressed interest both in using the mail to bring narcotics into FCHC and paying "Peter" directly or via a third party, his letter to Matos may have been a component of this scheme.  See Commonwealth v. Ecker, 92 Mass. App. Ct. 216, 220-221 (2017) (rejecting contention "that it was arbitrary and capricious" for jail personnel to open all of defendant's mail, rather than mail addressed only to particular person, because personnel could reasonably presume defendant might attempt to contact person "through third parties").  Cf. Rosa, 468 Mass. at 244 ("There is no suggestion in any of our cases that it is necessary to make an individualized determination whether the monitoring and recording of a particular inmate call serves a penological purpose").  Although there was some ambiguity as to when Goodell became aware that the defendant referenced "Tiffany" while speaking to "Peter," that Tiffany Matos may plausibly have been the same "Tiffany" of whom the defendant spoke further underscores the reasonableness of FCHC personnel's interception of the defendant's letter.
            As the motion judge observed, FCHC personnel's knowledge of the defendant's incipient plan to obtain narcotics as of July 6, 2016, was sufficiently specific, such that "it was neither arbitrary, unreasonable, nor inconsistent with any law or regulation" for FCHC's superintendent to authorize seizure of the defendant's mail at that juncture.  See, e.g., 103 Code Mass. Regs. § 481.12(2)(a) (2022) (permitting, with superintendent's authorization, reading of inmates' outgoing nonprivileged mail to prevent interference with institutional security or if such mail "might facilitate, encourage or instruct in criminal activity"); 103 Code Mass. Regs. § 481.14(2)(a)-(b) (2022) (grounds for authorization to read inmates' outgoing mail exist where mail contains plans for introducing contraband into facility, criminal activity, or activity in violation of institutional rules).
            For the foregoing reasons, we conclude that the defendant did not possess an objectively reasonable expectation of privacy in his nonprivileged outgoing letter to Matos.  Therefore, the motion judge did not err in denying the defendant's pretrial motion to suppress the letter.
            c.  Relief pursuant to G. L. c. 278, § 33E.  The defendant asks this court for relief pursuant to our authority under G. L. c. 278, § 33E.  Our plenary review of the evidence reveals no basis on which to grant a new trial or reduce the defendant's degree of guilt given the overwhelming evidence in support of the jury's verdict.  We do, however, pause briefly to address an error in the jury voir dire in this case.
            On the first day of jury empanelment, the pool of potential jurors was asked, "Given the nature of the charges, would you be uncomfortable finding the defendant guilty simply based on eyewitness testimony?"  On the second and third days of jury empanelment, the pools of potential jurors were asked, "Given the nature of the charges presented, would you be uncomfortable finding Mr. Rios guilty simply based on the testimony of witnesses?"  Among the nine jurors who answered this question affirmatively and proceeded to individual attorney-led voir dire, eight were not seated on the jury either due to hardship or challenges for cause based on their responses to other voir dire questions.  The lone juror who was seated was selected as an alternate and did not participate in the deliberations.
            Given that the alternate juror did not participate in deliberations, and given the overwhelming evidence of guilt in this case, that such a question was asked did not create a substantial likelihood of a miscarriage of justice and does not necessitate a new trial.  See Commonwealth v. Dowds, 483 Mass. 498, 502 (2019).  We instead note the issue to reiterate the impropriety of voir dire questions that ask prospective jurors to "convict" a defendant based on hypothetical circumstances related to the case.  See Commonwealth v. Montgomery, 495 Mass. 238, 239 (2025).
            Although a trial judge is vested with broad discretion in the jury voir dire process, Superior Court rules and our existing jurisprudence provide several guardrails.  See Montgomery, 495 Mass. at 247; Commonwealth v. Dabney, 478 Mass. 839, 848-850, cert. denied, 586 U.S. 846 (2018).  Among them, as we recently discussed in Montgomery, is a restriction on questions that "commit[] the jury to a verdict in advance or [have] the effect of identifying and selecting jurors predisposed to convicting the defendant based on evidence the Commonwealth will present" (quotations and alterations omitted).  Montgomery, supra at 245, quoting Commonwealth v. Brown, 477 Mass. 805, 821 (2017), cert. denied, 586 U.S. 826 (2018).  The voir dire question at issue here -- asking jurors whether they would be "uncomfortable finding the defendant guilty simply based on eyewitness testimony" -- is the type of question that should be avoided, as it carries the inherent risk of "commit[ing]" prospective jurors to convicting the defendant "on the basis of the very form of evidence the Commonwealth would present."  Montgomery, supra at 246.
            d.  Firearm licensure.  Pursuant to our decision in Guardado II, 493 Mass. 1, the defendant seeks vacatur of his convictions of carrying a firearm without a license, unlawful possession of a firearm without an FID card, and unlawful possession of ammunition without an FID card and a remand for a new trial on these charges.
            In light of the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), we held in Commonwealth v. Guardado, 491 Mass. 666, 690 (2023) (Guardado I), that "the absence of a license is an essential element of the offense of unlawful possession of a firearm."  We subsequently held in Guardado II, 493 Mass. at 7, that a new trial is the proper remedy for affected cases that were active or pending on direct review on the date Bruen issued.
            The defendant's case falls within the ambit of Guardado II.  As our review of the record indicates, and in line with the Commonwealth's concession to the same effect, no evidence was offered at the defendant's trial as to his licensure status.  After stating that there was no evidence on this issue at trial, the trial judge instructed the jury that "the issue of a license or exemption is not relevant to your deliberations in this case and, therefore, you should put it out of your mind."  Accordingly, we vacate the defendant's convictions under G. L. c. 269, § 10 (a) and (h), and remand those charges.
            3.  Conclusion.  Pursuant to our holding in Guardado II, we vacate the defendant's convictions under G. L. c. 269, § 10 (a) and (h), and remand those charges to the Superior Court for a new trial.  We affirm the defendant's convictions of murder in the first degree and of the other firearm offenses and the orders denying his motions to suppress and for a new trial.
So ordered.
 
footnotes

 
            [1] We acknowledge the amicus brief in support of the defendant submitted by the New England Innocence Project and the Innocence Project.
            [2] Jonathan and Nathan Guevara are brothers.  Because they share a surname, we refer to them by their first names.  Because Natalie Rivera shares a surname with another person involved in these events, described infra, we refer to her by her first name.
            [3] Because Michael Rivera and Natalie Rivera share a surname, we refer to Michael by his first name. 
            [4] Because he shares a surname with the defendant, we refer to Nelson Rios as "Nelson."
            [5] The trial record contains conflicting testimony on this point.  Self testified that only he and Jonathan were on the second trip during which the body and cell phone were found, with Medina joining them on the third trip to secure the crutches.  Medina testified that she was present for the second and third trips, including when the victim's body was found during the second trip.
            [6] A ShotSpotter system "identifies firearm discharges by sound and directs officers to the general location of the shots."  Commonwealth v. Tse, 495 Mass. 74, 75 n.2 (2024), quoting Commonwealth v. Cuffee, 492 Mass. 25, 27 n.2 (2023).
            [7] At trial, Cayabyab testified that the "comments section" in ShotSpotter's automatically generated report for the March 24 activation, which is distinct from the "forensic report" he was tasked with providing, "state[d] . . . that [the activation] was possibly mislocated."
            [8] We note that, although it was not requested in the instant case, a Daubert-Lanigan hearing should be allowed if so requested to further inform the court regarding retrospective forensic use of ShotSpotter technology.  See Commonwealth v. Wilkerson, 486 Mass. 159, 172 (2020) (where defendant does not request Daubert-Lanigan hearing prior to trial, issue is waived on appeal).  See also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-595 (1993); Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994).  Although Daubert-Lanigan hearings have been conducted to assess the reliability of ShotSpotter evidence in other States, see, e.g., J.A.R. v. State, 374 So. 3d 25, 30-31 (Fla. Dist. Ct. App. 2023) (no abuse of discretion to admit expert testimony regarding ShotSpotter alert of shots fired at particular address based on finding that such testimony "satisfied all three prongs of Daubert"); State v. Hill, 288 Neb. 767, 793-794 (2014) (trial judge properly admitted expert testimony about ShotSpotter to determine time and location of shots fired after Daubert hearing on reliability of global position system "triangulation methodology"), we are not aware that any Massachusetts court has undertaken a Daubert-Lanigan hearing regarding the retrospective forensic use of ShotSpotter technology.
            [9] During the Commonwealth's cross-examination of the defendant's audio expert, Lindsay Hawk, the following exchange occurred:
            Q.:  "Where is the chip?"
            A.:  "In the phone."
            Q.:  "So, if the date on the chip is wrong, then the created by date would also be wrong?"
            A.:  "That's true, but."
            Q.:  "That's all I was asking.  Thank you very much."
            [10] At trial, Medina testified that Nelson Rios was sometimes referred to as "Pito."
            [11] As there was no error in the denial of the motion to suppress, we need not resolve the antecedent question whether the defendant's Fourth Amendment and art. 14 arguments were properly preserved.